**AMERICAN BOILER MANUFACTUR-ERS ASSOCIATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

and

**Local Union 455 of the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, Intervenor.**

**No. 19033.**

United States Court of Appeals
Eighth Circuit.

Dec. 6, 1968.

Rehearing En Banc Denied Jan. 21, 1969.

Rehearing Denied Jan. 29, 1969.

See also, 8 Cir., 404 F.2d 556.

Kenneth C. McGuiness, of Vedder, Price, Kaufman, Kammholz & McGuiness, Washington, D. C., for petitioner; Stanley R. Strauss, Washington, D. C., on brief and reply brief.

Leonard M. Wagman, Atty., National Labor Relations Board, Washington, D. C., for respondent; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Gary Green, Atty., N. L. R. B., with him on briefs.

Donald J. Capuano, of O'Donoghue & O'Donoghue, Washington, D. C., for intervenor, United Assn. Pipefitters Local Unions 455 and 539; Martin F. O'Donoghue and Patrick C. O'Donoghue, Washington, D. C., on brief with him.

Gerard D. Reilly, Winthrop A. Johns and Lawrence T. Zimmerman, Washington, D. C., for Associated General Contractors of America and Mechanical Contractors Assn. of America, Inc., and John H. Pratt, Washington, D. C., for Air-Conditioning and Refrigeration Institute, on brief as amici curiae for Associated General Contractors of America, Mechanical Contractors Assn. of America, Inc., and Air-Conditioning and Refrigeration Institute.

Before MEHAFFY, GIBSON and HEANEY, Circuit Judges.

HEANEY, Circuit Judge.

This is the second time that this matter has been before this Court. On the first occasion, we enforced the Board's order in part. We then remanded the matter to the Board to determine the legality of a "fabrication" clause in a collective bargaining agreement between the United Association Pipe Fitters Local Union No. 455, and the St. Paul Association of Plumbing, Heating and Mechanical Contractors, Inc., and to take other action consistent with the views expressed in the opinion. American Boiler Manufacturers Association v. N. L. R. B., 366 F.2d 815 (8th Cir. 1966).

The facts are reported in detail in the two decisions of the Board[1] and the earlier decision of this Court, and will be repeated here only to the extent necessary to an understanding of the opinion.

Packaged boilers with trim piping attached were introduced and used in the St. Paul area before 1941. By the mid-1940's, ten per cent of the boilers being installed were of the packaged variety.

Their use increased rapidly and by 1963, had risen to sixty to eighty-five per cent of all boiler installations.

Prior to the use of packaged boilers, the boilers and the trim piping were shipped separately and assembled on the job site by members of the Union. The advent of packaged boilers resulted in a decrease of work at the job site for members. The work claimed took two men about two days for each installation.

In 1959 and 1961, the Union tried unsuccessfully to obtain a clause in their agreement with the Association requiring that trim piping be installed by unit employees. They obtained such a clause in 1963:

"Article II.

\* \* \* \* \* \*

"(c) Fabrication.

"As a primary working condition, it is agreed that all pipe formations, systems, or controls, or component parts thereof, included within the nonpurchase list attached hereto and made a part hereof as Exhibit I, as amended from time to time as provided in this agreement, shall be fabricated on the job site or in the shop of an Employer[2] within the bargaining unit who is bound by this agreement, except as otherwise mutually agreed upon with relation to any particular job."

"Exhibit I.

"Non-Purchase List.

\* \* \* \* \* \*

"2. On boilers, all piping beyond the gas and oil burners proper and trim piping on those boilers 30 horsepower or more."

The fabrication clause did not cover construction contracts signed or bid on prior to the execution of the agreement.

The agreement provided for a fabrication committee, composed of an equal number of representatives of the Union and the Association, to apply, interpret

---

1. American Boiler Mfrs. Assn., 167 N.L. R.B. No. 79, 66 L.R.R.M. 1098 (1967); American Boiler Mfrs. Assn., 154 N.L. R.B. No. 12, 59 L.R.R.M. 1727 (1965).

2. All of the disputes involved in the instant case were on the job site.

and enforce the provisions of the fabrication clause.[3]  It provided that deadlocks were to be broken through arbitration.

■  This proceeding arose out of the efforts of the Union to secure compliance with the fabrication clause on three jobs —3–M, Aircon and Upper Midwest Piping.  A common question is presented as to each job:  Is the fabrication clause a per se violation of § 8(e) of the National Labor Relations Act, 29 U.S.C.A. § 158 et seq.?[4]  The Board answered in the negative.  We agree.

We stated in our earlier decision that the Supreme Court could be expected to set forth guidelines which would aid in answering the above question.  The guidelines were forthcoming in the companion cases of National Woodwork Manufacturers Association v. National Labor Relations Board, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967), and Houston Insulation Contractors Association v. National Labor Relations Board, 386 U.S. 664, 87 S.Ct. 1278, 18 L.Ed.2d 389 (1967).[5]

In *National Woodwork*, a Carpenters Union and a Contractors Association had agreed that Union members would not handle doors which had been fitted prior to being furnished on the job.  Prefitted doors were delivered to the job of a signator contractor.  When the Union threatened not to hang the doors, the contractor agreed to substitute blank doors to be fitted by the carpenters on the job.  The Union was charged with violating §§ 8(e) and 8(b) (4) (B) of the Act.[6]

3.  "Upon the execution of this agreement a committee shall be appointed or elected, to be known as the Industry Fabrication Committee, consisting of six (6) members, three (3) to represent the Employer Association and three (3) to represent the Union.  Each member shall serve upon said committee until his successor is chosen by the party selecting his predecessor.  Two members present from each side shall be necessary for a quorum, and if in any meeting the representation is unequal, the side having a member absent shall have his vote to cast, so that in all meetings voting strength shall be equal to both sides.  *  *  *"

4.  "(e) It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void:  *  *  *"
§ 8(e), National Labor Relations Act, 29 U.S.C.A. § 158 et seq.

5.  These decisions invoked a great deal of commentary in both trade journals and law reviews.  See, Browne, The Court, the N.L.R.B. and Free Collective Bargaining—A Second Look, 54 A.B.A.J. 561 (1968);  Johns, Analysis of Philadelphia Pre-Cut Door Decision, Labor Law Bulletin of the Associate General Contractors of America No. 9 at 1 (May 24, 1967);  Petro, Unions, Housing Costs, and the National Labor Policy, 32 Law & Contemp.Prob. 319 (1967);  The Supreme Court, 1966 Term, 81 Harv.L.Rev. 247 (1967);  Note, Secondary Boycotts and Work Preservation, 77 Yale L.J. 1401 (1968);  Note, 28 La.Rev. 279 (1968);  Note, 46 Texas L.Rev. 283 (1967);  34 Brooklyn L.Rev. 332 (1968).

6.  "(b) It shall be an unfair labor practice for a labor organization or its agents—
       *       *       *       *       *
    "(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—
       *       *       *       *       *
    "(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recog-

The Board dismissed both allegations. The Supreme Court affirmed stating that a Union has a right to protect work "traditionally" done by its members at job sites by concerted activity directed towards a primary employer. The holding in *National Woodwork* was summarized in *Houston* as follows:

"* * * [C]ollective activity by employees of the primary employer, the object of which is to affect the labor policies of that primary employer, and not engaged in for its effect elsewhere, is protected primary activity. * *"

*Houston*, 386 U.S. at 668, 87 S.Ct. at 1281.

*Houston* extended *National Woodwork* to a situation in which a local Union sought to preserve work opportunities of the members of another local but employed by the same employer. The Court said:

"A boycott cannot become secondary because engaged in by primary employees not directly affected by the dispute, or because only engaged in by some of the primary employees, and not the entire group. Since that situation does not involve the employer in a dispute not his own, his employees' conduct in support of their fellow employees is not secondary and, therefore, not a violation of § 8(b) (4) (B)."

*Houston*, 386 U.S. at 669, 87 S.Ct. at 1281.

*National Woodwork and Houston* give support to the Board's decision in this case, but the petitioner argues that they are not controlling as the Union here is seeking to reacquire, as well as preserve, work. The petitioner urges that *National Woodwork* and *Houston* intended the term "traditional work" to encompass only that work which is currently, continuously and exclusively performed by unit employees. The petitioner relies on two statements in *National Woodwork* to support its position:

"We * * * have no occasion today to decide the questions which might arise where the workers carry on a boycott to reach out to monopolize jobs or acquire new job tasks when their own jobs are not threatened by the boycotted product."

*National Woodwork*, 386 U.S. at 630–631, 87 S.Ct. at 1261.

"* * * This, then, is not a case of a union seeking to restrict by contract or boycott an employer with respect to the product he uses, for the purpose of acquiring for its members work that had not previously been theirs."

*National Woodwork*, 386 U.S. at 648, 87 S.Ct. at 1270 (concurring opinion of Mr. Justice Harlan).

We reject the petitioner's contention. The record in *National Woodwork* demonstrates that the objective of the Union was to reacquire, as well as preserve, work. There, as here, reacquisition of work was involved.[7] The trial examiner, whose findings were adopted by the Board, indicated that the use of blank doors may have been the exception rather than the rule:

"* * * The record shows that there have been occasions when millwork, including doors, came to a jobsite without having been previously cut out and fitted, that the tasks of cutting

---

nize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;" § 8(b) (4) (B), National Labor Relations Act, 29 U.S.C.A. § 158 et seq.

7. The trial examiner also found that one-third of the doors being shipped into the Philadelphia area by two large manufacturers, at the time the unfair labor practice charge was lodged, were precut or prefit doors. Metropolitan District Council of Philadelphia and Vicinity of the United Brotherhood of Carpenters and Joiners of America, AFL-CIO, Etc., 149 N.L.R.B. No. 65, 656–657.

out and fitting such millwork, including doors, were considered by the contracting parties to be unit work to be performed by the job-site carpenters, and that the carpenters on the jobsite did in fact perform those tasks on those occasions. * * * "

Metropolitan District Council of Philadelphia and Vicinity of the United Brotherhood of Carpenters and Joiners of America, AFL–CIO, Etc. [Board Decision in National Woodwork], 149 N.L. R.B. No. 65, 656–57.

■ Neither of the statements cited by the Association support the view that traditional work is limited to work which is currently, continuously and exclusively performed by the unit members. Both statements refer to the possibility of acquiring new jobs or job tasks —jobs that had never been performed.

We express no opinion as to whether a fabrication clause can be enforced if the objective is to acquire work which unit employees had never performed or work which they may have performed in the past but have completely lost before the clause was negotiated.[8] We hold only that the term "traditional work" includes work which unit employees have performed and are still performing at the time they negotiated a work-preservation clause.

■ It follows from the teachings of National Woodwork that a union can protect this work by concerted activities where the objective is to affect the labor policies of the employer with whom they have a collective bargaining agreement.

The petitioner further argues that other sections of the Act, §§ 8(d) (4) (D), 10(k) and 8(b) (6), protect an employer against Union work aggrandizement. Thus, it would be incongruous to interpret § 8(e) so as to allow reacquisition of work, a form of aggrandizement.

This Court finds no such incongruity. These sections are not blanket prohibitions. They are aimed at resolving particular kinds of disputes arising out of a Union's attempt to acquire work. Sections 8(b) (4) (D) and 10(k) deal with jurisdictional disputes. Section 8(b) (6) deals with situations where a Union, under the guise of reacquiring work, extracts payments from an employer for services which are not performed or not to be performed.[9]

■ The petitioner contends that economic injury to its members and their employees will flow from permitting the Union to reacquire the work involved in affixing the trim piping on the job. The Supreme Court answered this argument in National Woodwork when it said:

"* * * [H]owever severe the impact of primary activity on neutral employers, it was not thereby transformed into activity with a secondary objective."

National Woodwork, 386 U.S. at 627, 87 S.Ct. at 1259.

The petitioner also argues that an affirmance of the Board's decision will discourage the use of cheaper and better products and will thus retard the growth and developments of new products and techniques.

■ While this argument may or may not have merit, the Supreme Court made it clear in National Woodwork that it would not lightly impute to Congress an intent in § 8(e) to preclude labor management agreements designed to ease the impact on employees that may be affected by advanced technology.[10]

8. For a discussion of this problem, see, Johns, Analysis of Philadelphia Pre-Cut Door Decision, supra note 5; The Supreme Court, 1966 Term, supra note 5 at 251–252; Note, Secondary Boycotts and Work Preservation, supra note 5 at 1410–1412; Note, 28 La.L.Rev. 279, 289–290 (1968); 34 Brooklyn L.Rev. 332, 336 (1968).

9. For a discussion of the problem, see, Lesnick, Job Security and Secondary Boycotts: The Reach of NLRA 8b4 and 8e, 113 U.Pa.L.Rev. 1000, 1039 (1965).

10. They observed:
"In addition to all else, '(t)he silence of the sponsors of (the) amendments is pregnant with significance . . . .'

■ The petitioner's final contention is that the fabrication clause was secondary and unlawful because it was intended to aid the Union's members generally, rather than unit employees. We find this argument to be without merit. The Board found that the Union's objective was "to preserve for employees in the unit work traditionally done by them * * * not for members of the Union generally * * *". This finding is amply supported by the record.

The fabrication clause gives as its objective the preservation of work for the bargaining unit:

"(4) The Committee shall endeavor to meet at least quarterly for the purpose of review of the lists and possible alterations of the same, having in mind the purpose of preserving locally as much work as possible *within this bargaining unit*, while meeting the current needs of the Industry." [Emphasis added.]

The record is clear that the trim piping, if not done by the boiler manufacturer in its plant, is done on the construction job site by pipefitters. Since the Union had no objectives as to the employees of any boiler manufacturer, the coverage of the clause was limited to the pipefitters who were employees of the contractors. These contractors were either members of the multi-employer unit or employers with individual contracts with the Union.

■ The cases cited by the petitioner [11] are inapposite. They stand for the principle that where a union's objective is to benefit union members generally,

[National Labor Relations Board] v. Fruit & Vegetable Packers [etc.] supra, 377 U.S. at 66, 84 S.Ct. 1063 at 1068, 12 L.Ed.2d 129, at 135. Before we may say that Congress meant to strike from workers' hands the economic weapons traditionally used against their employers' efforts to abolish their jobs, that meaning should plainly appear. '(I)n this era of automation and onrushing technological change, no problems in the domestic economy are of greater concern than those involving job security and employment stability. Because of the potentially cruel impact upon the lives and fortunes of the working men and women of the Nation, these problems have understandably engaged the solicitous attention of government, of responsible private business, and particularly of organized labor.' Fibreboard Paper Prods. Corp. v. [National Labor Relations Board] 379 U.S. 203, 225, 85 S.Ct. 398 [411] 13 L.Ed.2d 233, 247, [6 A.L.R. 3d 1130] (concurring opinion of Stewart, J.). We would expect that legislation curtailing the ability of management and labor voluntarily to negotiate for solutions to these significant and difficult problems would be preceded by extensive congressional study and debate, and consideration of voluminous economic, scientific, and statistical data. The silence regarding such matters in the Eighty-sixth Congress is itself evidence that Congress, in enacting § 8(e), had no thought of prohibiting agreements directed to work preservation.

In fact, since the enactment of § 8(e), both the Subcommittee on Employment and Manpower of the Senate Committee on Labor and Public Welfare, and the Subcommittee on Unemployment and the Impact of Automation and the Select Subcommittee on Labor of the House Committee on Education and Labor have been extensively studying the threats to workers posed by increased technology and automation, and some legislation directed to the problem has been passed. We cannot lightly impute to Congress an intent in § 8(e) to preclude labor-management agreements to ease these effects through collective bargaining on this most vital problem created by advanced technology."
National Woodwork Manufacturers Association v. National Labor Relations Board, 386 U.S. 612, 640–642, 87 S.Ct. 1250, 1266, 1267 (1967).

11. N. L. R. B. v. New York Lithographers & Photo-Engravers Union No. One-P, etc., 385 F.2d 551 (3d Cir. 1967) ; N. L. R. B. v. Local 217, United Ass'n of Journeymen & Apprentices, etc., 361 F. 2d 160, 162 (1st Cir. 1966) ; N. L. R. B. v. Joint Council of Teamsters No. 38, 338 F.2d 23, 28 (9th Cir. 1964) ; N. L. R. B. v. Milk Wagon Drivers' Union, Local 753, 335 F.2d 326 (7th Cir. 1964) ; United Mine Workers, 165 N.L.R.B. No. 49, 65 L.R.R.M. 1324 (1967) ; Balto. Lithographers and Photoengravers Union, Local 2-P, 160 N.L.R.B. No. 90, 63 L.R.R.M. 1126 (1966) ; Local Union No. 710, Etc., 143 N.L.R.B. No. 117, 53 L.R.R.M. 1475 (1963).

as distinguished from employees in the particular bargaining unit, the objectives exceed the union's legitimate interests in that bargaining unit. Accordingly, efforts taken in support of the objectives constitute unlawful secondary action. Here, we have upheld the Board's finding that the Union was not reaching out to benefit union members generally wherever employed.

■ To summarize, we hold that a collective bargaining agreement which seeks to preserve work currently being performed by unit employees and to re-acquire that portion lost is not violative of § 8(e). It follows from the teachings of *National Woodwork* that employees can enforce such an agreement through concerted activity which is directed at their employer.

In affirming the Board's decision, we reiterate the cautionary footnote in *National Woodwork*:

"We likewise do not have before us in these cases, and express no view upon, the antitrust limitations, if any, upon union-employer work-preservation or work-extension agreements. * * *"

*National Woodwork*, 386 U.S. at 631, n. 19, 87 S.Ct. at 1261.

The holding here and that in *National Woodwork* are dispositive of the issues raised in the Upper Midwest Piping incident. The decision of the Board with respect to that incident is, therefore, affirmed.

We turn to a discussion of issues raised in Aircon and 3–M that were not resolved by *National Woodwork* or *Houston* and that have not heretofore been discussed in this opinion.

## THE AIRCON DISPUTE

After signing the collective bargaining agreement with the Union, Aircon contracted to install a boiler in a St. Paul building. The specifications required the installation of a packaged boiler. The boiler was shipped to the job site and accepted by Aircon. The Union learned of this, called the matter to the attention of Aircon and requested a meeting of the fabrication committee. Aircon attended the meeting and was informed that its acceptance of the boiler was a violation of the fabrication clause. The committee voted unanimously to assess Aircon a penalty of $100 for the violation.[12] Aircon paid the $100 and installed the packaged boiler as delivered.

The Board found that the committee's action "constituted the entering into of a new ad hoc agreement * * *." It held that the ad hoc agreement was not violative of § 8(e):

"* * * [T]o the extent that it involved work-preservation [the agreement fell] * * * outside the scope of Section 8(e); to the extent that [the agreement falls within the scope of that section] * * *, it would be protected by the construction industry proviso. The fact that the agreement involved payment of $100 by Aircon does not * * * deprive the * * * agreement of the proviso's protection."

*American Boiler Mfrs. Assn.*, 154 N.L. R.B. No. 12, 59 L.R.R.M. 1727, 1731 (1965).

The Board also held that, as there was no evidence that the Union sought any agreement other than the one reached, the Union's conduct in securing the agreement was not violative of § 8(b) (4) (A).[13]

12. The payment was made to the Industry Fund, which had been established for the benefit of employees in the work unit.

13. "(b) It shall be an unfair labor practice for a labor organization or its agents—
      *      *      *      *      *
   "(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person en-

We reject the Board's holding that the proceeding before the fabrication committee resulted in a new ad hoc agreement. No new agreement with a secondary objective was reached and no additional parties became bound to the original agreement. The proceeding before the fabrication committee was nothing more than the enforcement of the original fabrication clause in accordance with the collective bargaining agreement. If there was a § 8 violation, it was under § 8(b) (4) (B) and not under § 8(e) or § 8(b) (4) (A).

The question then is: Did the Union violate § 8(b) (4) (B) by bringing Aircon's violation to the attention of the fabrication committee and voting to assess a penalty against it? The Board answered this question in the negative. It reasoned that the Union had followed a peaceful method of resolving the dispute and that, therefore, its conduct did not constitute coercion within the meaning of § 8(b) (4) (B).

In seeking review of the Board's determination, the petitioner concedes that this issue is only presented if we hold that the Board's doctrine of "right of control" [14] is a correct rule of law. In light of our contrary holding in the companion Minneapolis case, we need not decide this issue. The Union's conduct, even if coercive, was not violative of § 8(b) (4) (B) for the same reason that it was not violative as to Upper Midwest Piping. Its sole objective was the preservation of traditional work for its members.

We affirm the order of the Board for the reasons stated above.

### THE 3–M DISPUTE

3–M contracted with Hickey, a member of the Contractors Association, to install packaged boilers. 3–M had ordered the boilers prior to contracting with Hickey.

The Union learned of Hickey's intent to install the packaged boilers and threatened to strike if the packaged boilers were delivered to the job. The threats were made to both Hickey and 3–M.

After some discussion, 3–M agreed to revise its order. It instructed the manufacturer to ship unpackaged boilers. When they arrived at the job site, the Union and 3–M signed a memorandum agreement stating that the Union had advised 3–M that it would not install the packaged boilers. The memorandum also stated that 3–M had revised its specifications to provide that certain fabrication work would be performed on the job site.

This Court held that the Union's conduct as to 3–M was a violation of § 8(b) (4) (B) because 3–M was neither the employer of the employees involved in the dispute nor a party to the collective bargaining agreement. It was not a primary employer. American Boiler Manufacturers Association v. N. L. R. B., supra at 822. We also held that the Union's conduct as to Hickey was violative of § 8(b) (4) (B) because Hickey did not have the "right of control."

We did not decide, however, whether the Union had also violated § 8(e) and § 8(b) (4) (A) by entering into the

gaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

"(A) forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by subsection (e) of this section;"

§ 8(b) (4) (A), National Labor Relations Act, 29 U.S.C.A. § 158 et seq.

14. Pipe Fitters Local No. 120, United Association of Journeymen and Apprentices of the United States and Canada, AFL-CIO, 168 N.L.R.B. No. 138, 67 L.R.R.M. 1034 (1968) ; Metropolitan District Council of Philadelphia and Vicinity of the United Brotherhood of Carpenters and Joiners of America, AFL-CIO, Etc., 149 N.L.R.B. No. 65, 57 L.R.R.M. 1341 (1964) ; Ohio Valley Carpenters District Council, United Brotherhood of Carpenters and Joiners of America, AFL-CIO (Cardinal Industries, Inc.), 144 N.L.R.B. No. 16, 54 L.R.R.M. 1003 (1963).

memorandum agreement with 3–M. We remanded the matter to the Board for that determination.

■ Notwithstanding our remand, the Board declined to rule on this issue. It gave as its reason the fact that no specific allegation as to the validity of the agreement between the Union and 3–M had been made in the original complaint. The Board erred in failing to do so. It has an obligation to decide material issues which have been fairly tried by the parties even though they have not been specifically pleaded. American Boiler Manufacturers Association v. N. L. R. B., supra at 821.

■ We will not remand to the Board for a second time. We hold that the memorandum agreement between the Union and 3–M was violative of § 8(e). 3–M was not a party to the original agreement and did not employ members of the bargaining unit. The agreement was not, therefore, directed at the labor policies of the primary employer. The Union's sole objective was to require 3–M to refrain from requiring Hickey to use packaged boilers on the job.

Nor does the proviso to § 8(e) validate the agreement. The proviso to § 8(e) reads:

" * * * *Provided*, That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building structure, or other work: * * *."

29 U.S.C.A. § 158.

Since 3–M was not an employer in the construction industry, the proviso does not apply.

We, therefore, hold that the threats of strike by the Union to coerce this agreement were violative of § 8(b) (4) (A).

We remand to the Board for action consistent with this opinion.

NATIONAL LABOR RELATIONS BOARD, Respondent,

