**LOCAL UNION NO. 98 OF the SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION and its Agents Malcolm Hamilton, Jr., and Lincoln Baird, Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**Cincinnati Sheet Metal and Roofing Company, Intervenor.**

**No. 22691.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 8, 1969.

Decided June 18, 1970.

---

51. *Id.*

Mr. Mortimer Riemer, Cleveland, Ohio, with whom Mr. Edward J. Hickey, Washington, D.C., Jr., was on the brief, for petitioners.

Mr. Glen M. Bendixsen, Attorney, National Labor Relations Board, with whom Messrs. Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate

Gen. Counsel, and Marcel Mallet-Prevost, Asst. Gen. Counsel, were on the brief, for respondent.

Mr. Arnold Morelli, Cincinnati, Ohio, for intervenor.

Before WRIGHT, TAMM and Mac-KINNON, Circuit Judges.

TAMM, Circuit Judge:

This case arises on petition of Local Union No. 98, Sheet Metal Workers' International Association (hereinafter "the Union") to set aside an order of the National Labor Relations Board; the Board has filed a cross-application for enforcement of its order. The controversy arose when Cincinnati Sheet Metal and Roofing Company, also known as Ajax Company, filed unfair labor practice charges against the Union. Ajax took this action because the Union had forced two employers to stop using products which Ajax manufactured; the Union insisted that the employers install only "union" pipe and adjustable elbows. (J.A. 99) In this context "union" products are those produced at the job site by employees working at the "construction rate"; the products in issue here were manufactured at "production rates" in the Ajax shops. In spite of the fact that Ajax employs members of Local Union 183, Sheet Metal Workers' International Association, this is a "production local" rather than a "construction local" as is Local 98, and items made by Ajax are therefore considered "non-union" by Local 98, even though produced by members of the same International as Local 98. (*Id.*)

After a hearing held in May, 1968, the trial examiner determined that the Union had violated sections 8(e), 8(b) (4)(i) and (ii)(B) of the National Labor Relations Act, 29 U.S.C. §§ 151–187 (1964); the Board affirmed the decision of the trial examiner, with minor modifications, on January 14, 1969. (174 N.L.R.B. No. 22.)

The issues presented by this case were stipulated by the parties at the pre-hearing conference to be the following:

1. Whether the Board properly found that the Union entered into an agreement in violation of Section 8(e) of the Act by maintaining, enforcing, or giving effect to Article II, Section 2, and Article VIII, Section 3 of the Standard Form of Union Agreement between the Union and the Sheet Metal Contractors of Southern Ohio.

2. Whether the Board properly found that the Union violated Section 8(b)(4)(i)(B) of the Act by inducing and encouraging employees of Standard and Veach [contractors who fabricate sheet metal products for use in their building contracts] to refuse to perform services or handle Ajax Company's products with an object of forcing or requiring the above-named employers to cease doing business with Ajax.

3. Whether the Board properly found that the Union violated Section 8(b)(4)(ii)(B) of the Act by threatening, coercing and restraining Standard and Veach with an object of forcing or requiring them to cease doing business with the Ajax Company.[1]

For reasons which we shall elaborate in dealing with each of these issues, we hold that the Board's findings and conclusions were proper and that they were supported by substantial evidence in the record.

## I. THE SECTION 8(e) CONTROVERSY

The Union involved in this action has more than 1,000 members who are employed by various sheet metal contractors doing business in a large area comprised of more than 50 counties in Southeastern Ohio and Kentucky. (J.A. 81–82, 98.) The Union negotiates collective bargaining agreements with employers; a basic contract clause required by

---

1. Brief for Petitioner at 1–2.

the Standard Form of Union Agreement reads as follows:

#### Article II

\* \* \* \* \* \*

Section 2. Subject to other applicable provisions of this Agreement, the Employer agrees that when sub-contracting for prefabrication of materials covered herein, such prefabrication shall be sub-contracted to fabricators who pay their employees engaged in such fabrication not less than the prevailing wage for comparable sheet metal fabrication, as established under provisions of this Agreement.

(J.A. 89) Relief from the strictures embodied in this clause was granted in another section of the contract:

#### Article VIII

\* \* \* \* \* \*

Section 3. Notwithstanding the provisions of Section 2 of this Article and Section 2 of Article II, the following items may be manufactured for sale to the trade or purchased at the rates specified below:

1. High pressure pipe and fittings (local building and construction wage rates)

\* \* \* \* \* \*

6. Fabricated pipe and fittings for residential installations only (production wage rates).

(J.A. 90.)

2. Trial Examiner's Decision, J.A. 104–105.

3. The Trial Examiner included in his Findings of Fact a finding that these items were purchase items:

The credited evidence in this record is most conclusive in showing that the employer members of Sheet Metal Contractors—including Veach and Standard—normally and regularly purchase from mass production manufacturers practically all, if not the entire list of items listed under Article VIII, Section 3, except in those limited situations wherein emergency conditions existed, or where special small sizes of pipe or other items are required and such products were not readily available from the manufacturer.

(J.A. 109.)

The present controversy arose because of the Union's enforcement of these contract clauses. It appears that employers who hired Union construction site workers purchased round pipe and adjustable elbows for use on projects under construction in the Union's territory, rather than having the Union members produce these articles. While some larger contractors manufactured these supplies, both for their own use and for sale to smaller contractors, the contractors here involved (Standard and Veach) had never manufactured adjustable elbows or round pipe over three feet long, they did not have the equipment to produce these items, and the sheet metal workers who were employed by them had not been trained to make these items.[2]

While it is true, as petitioner suggests, that round pipe and adjustable elbows can be made in a well-equipped sheet metal shop, Union members who had worked in this territory for as long as 36 years testified that these items were traditionally purchase items rather than items made at the job site. (J.A. 104–105.)[3]

The gravamen of the section 8(e)[4] complaint is that the above-quoted contract clauses are designed "to benefit the Union generally," rather than to preserve for employees of the boycotted employer work which they had traditionally done. (J.A. 107.) It is conceded that the controlling cases are National

4. Section 8(e) of the Act makes it an unfair labor practice for a labor organization or employer:

[T]o enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforceable and void \* \* \*.

29 U.S.C. § 158(e) (1964).

Woodwork Mfgrs. Ass'n v. NLRB, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 rehearing denied, 387 U.S. 926, 87 S.Ct. 2026, 18 L.Ed.2d 985 (1967), and Houston Insulation Contractors Ass'n v. NLRB, 386 U.S. 664, 87 S.Ct. 1278, 18 L.Ed.2d 389, rehearing denied, 387 U.S. 938, 87 S.Ct. 2047, 18 L.Ed.2d 1005 (1967), and that if the activity is primary (to preserve or recapture work for Union employees) it is outside the scope of section 8(e), but that if it is secondary (calculated to benefit the Union generally or to satisfy Union objectives elsewhere) it is unlawful and precluded by section 8(e). (Brief for Petitioner at 9–10, 21; Brief for Respondent at 11–13; J.A. 107.)

The Supreme Court stated the primary-secondary dichotomy succinctly in *National Woodwork* when it said:

> The determination whether the "will not handle" sentence * * * and its enforcement violated § 8(e) and § 8(b)(4)(B) cannot be made without an inquiry into whether, under all the surrounding circumstances, the Union's objective was preservation of work for [the contractor's] employees, or whether the agreements and boycott were tactically calculated to satisfy union objectives elsewhere. Were the latter the case, * * * the boycotting employer, would be a neutral bystander, and the agreement or boycott would * * * become secondary. There need not be an actual dispute with the boycotted employer * * * for the activity to fall within this category, so long as the tactical object of the agreement and its maintenance is that employer, or benefits to other than the boycotting employees * * * thus making the agreement or boycott secondary in its aim. The touchstone is whether the

agreement or its maintenance is addressed to the labor relations of the contracting employer *vis-à-vis* his own employees.

386 U.S. at 644, 645, 87 S.Ct. at 1268–1269.[5] The Trial Examiner applied this standard to the proceeding before him:

> Whether or not the aforementioned provisions in the * * * agreements violate Section 8(e) * * * is to be *determined by the object of the restrictive clauses or provisions in question.* * * * If the contractual provisions in question had as their object the preservation or protection of work traditionally and customarily performed by employees in the bargaining unit * * * they may be held harmless; but if instead they were designed to accomplish other union objectives * * * they are proscribed by the provisions of Section 8(e).

(Trial Examiner's Decision, J.A. 109; emphasis added.)

With such a clear-cut issue sharply drawn by the parties and the controlling cases, our sole task is to ascertain whether there was substantial evidence in the record to support the trial examiner's determination that the Union activity here "clearly demonstrates an object to benefit union members generally, and [is] 'tactically calculated to satisfy union objectives elsewhere,' and [is] not 'addressed to the labor relations of the contracting employer vis-a-vis his own employees' which the Supreme Court has said is 'the touchstone' in determining [its] validity." (Trial Examiner's Decision, J.A. 113.)

■■ In order to avoid invalidity by being classified as a boycott proscribed by section 8(e), the effect of the challenged contract clauses must have been

5. We have frequently examined agreements challenged under section 8(e) to determine whether the effect of the agreement is primary or secondary. Lewis v. NLRB, 122 U.S.App.D.C. 18, 350 F.2d 801 (1965); Meat and Highway Drivers, etc., Teamsters Local 710 v. NLRB, 118 U.S. App.D.C. 287, 335 F.2d 709 (1964); Truck Drivers Union Local No. 413 v. NLRB, 118 U.S.App.D.C. 149, 334 F.2d 539, cert. denied, 379 U.S. 916, 85 S.Ct. 264, 13 L.Ed.2d 186 (1964); Orange Belt Dist. Council of Painters v. NLRB, 117 U.S.App.D.C. 233, 328 F.2d 534 (1964).

to preserve work for bargaining unit sheet metal workers. There was overwhelming evidence in the record to support the trial examiner's finding that the items here in controversy were purchase items that had not previously been made by unit employees. (*See* page 1192 *supra*.) The following items appear in the examiner's findings of fact:

1. Scruggs [has] been employed for many years as a sheet metal worker * * * and the procedure he has observed is that adjustable round elbows and round pipe * * * are purchase items unless they have to be specially made. Scruggs testified that * * * on this job they purchased round pipe and adjustable elbows because such items are not made in the field. (J.A. 104.)

2. * * * Allen has been in the sheet metal trade in the * * * area for 22 years and credibly testified that the practice was always to purchase such items. * * * (J.A. 104–105.)

3. * * * Newman has been in the sheet metal business for 36 years, and testified [that] in his experience adjustable elbows are purchased, and that he cannot make such an elbow. He also testified that the practice has always been to purchase round pipe. * * * (J.A. 105.)

4. Raynard has been in the business for 22 years, and testified that adjustable elbows were always purchased, and the round pipe * * * was always a purchased item except for odd sizes. Raynard stated his shop has never made adjustable elbows and has never made rigid elbows * * * because they lack the equipment to do so. * * * He testified [that] up until 1967, Standard had purchased the Ajax brand of adjustable elbows and round pipe and Local 98 had never given him any problems in relation thereto, and the only reason Standard stopped purchasing was because of the incident in April involving * * * Standard. * * * (J.A. 105.)

In an attempt to rebut this strong evidence that these were not items produced by sheet metal workers in construction locals and which the Union was attempting to preserve through enforcement of the challenged clauses, the Union offered testimony by Mr. Hamilton—the Union representative who first informed Standard and Veach that they could no longer use the items involved here—to the effect that he had been a sheet metal contractor at one time, that he made round pipe, "and that he also had equipment to fabricate elbows and on some jobs made adjustable ones." (J.A. 106.) He further testified that:

[A]fter October, 1967, he returned to the steel metal trade, and [that he and his employer] fabricated round pipe and 6 inch adjustable elbows and that he himself made 26 gauge adjustable elbow[s]. Hamilton testified the cost per elbow was $2.50 plus his time in making it * * * about 25 minutes after he had laid out the first one, and he was being paid $5.29 per hour. Hamilton admitted he had purchased 6 inch adjustable elbows for about 90 cents each, and then went on to state that about 50 percent of the sheet metal contractors made adjustable elbows even though they could purchase them for about one-third of the price.

(Trial Examiner's Decision, J.A. 106.)

This testimony of one witness hardly refutes the weighty evidence outlined above, particularly when that evidence itself came from Union members, and in view of the trial examiner's observation that "there is no testimony by Hamilton that the fabrication of these items [was] traditionally and customarily performed in the normal or regular course of their work." (Trial Examiner's Decision, J.A. 109.)

This situation is clearly distinguishable from the circumstances extant in *National Woodwork* wherein the Union members traditionally fitted doors as

part of their craft. The Union object there was found to be the preservation of work traditionally and customarily performed by employees in the bargaining unit; this being the case, section 8(e) was held not to be violated by enforcement of the "will not handle" clause. Here, however, the weight of the evidence overwhelmingly shows that this work was not done in the past by the unit employees, and it could therefore not have been subject to preservation under the test laid down in *National Woodwork*.[6] On the basis of substantial evidence in the record—and bearing in mind the relevant test under section 8(e) (*see* page 1192 *supra*)—the trial examiner found:

In essence, what is directly relevant in this case is whether employees in the unit customarily and traditionally fabricated round pipe and adjustable elbows * * * and did the contractors assign such tasks to their employees in the general course of their business. *I submit this record clearly shows that all the items in question were normally purchased, and the employees only fabricated these items in situations where unusual or emergency work conditions existed, and, therefore, I cannot find the fabrication of these materials to be claimable unit work. I conclude that the work which was subject to the contractual provisions here in question was not traditionally and customarily performed by the employees, and the object of the restrictions so imposed was not the preservation of unit work.*

(Trial Examiner's Decision, J.A. 110; emphasis added.)[7]

The significance of this finding is devastating to the Union's case, particularly in light of the explication given the majority opinion in *National Woodwork* by Mr. Justice Harlan's concurring memorandum opinion:

The facts as found by the Board and the Court of Appeals show that the contractual restrictive-product rule in question, and the boycott in support of its enforcement, had as their sole objective the protection of union members from a diminution of work flowing from changes in technology. Union members traditionally had performed the task of fitting doors on the jobsite * * *. *This, then, is not a case of a union seeking to restrict by contract or boycott an employer with respect to the products he uses, for the purposes of acquiring for its members work that had not previously been theirs.*

(386 U.S. at 648, 87 S.Ct. at 1270; emphasis added.) Such is distinctly not the case here; rather, the record clearly indicates an attempt on the part of the Union to use the contract clauses in question for the purpose of "acquiring for its members work that had not previously been theirs." That being the case, the invocation of the contract clauses under these circumstances was properly found to be a violation of section 8(e) of the Act; the Board's finding of such a violation under the present facts is therefore upheld.[8]

It is, however, the opinion of this court that the recommended order of the trial examiner, as later modified by the Board, is much too broad. Al-

6. The other cases cited by petitioner to show that these items were fairly claimable as unit work are equally distinguishable from the present situation. *See, e.g.*, American Boiler Mfgrs. Ass'n v. NLRB, 404 F.2d 547 (8th Cir. 1968), in which it was held that the work involved in fitting "trim piping" to boilers at the job site had been lost by the purchase of "packaged boilers." In each of the cases cited the work involved had been done previously by the Union employees and had been lost due to incursions of manufactured goods.

7. The trial examiner also found that "if their [the contract clauses'] thrust serves no cognizable primary unit purpose then it is only reasonable to conclude that the aim is a secondary one." Trial Examiner's Decision, J.A. 114.

8. We note that our sister circuit has reached virtually an identical disposition under similar circumstances in NLRB v. Local No. 141 of Sheet Metal Workers' Int'l Ass'n, 425 F.2d 730 (6th Cir. May 5, 1970).

though the facts of the present controversy show clearly that there was no preservation of traditional work in this case, the contract clauses themselves are sound in theory and may be properly applied under appropriate circumstances; we therefore reverse the Board's order to the extent that it abrogates completely the challenged clauses and instruct the Board to amend its order to reflect this holding.

We stated in Teamsters Local 710 v. NLRB, 118 U.S.App.D.C. 287, 294, 335 F.2d 709, 716 (1964) that:

> Under § 8(e), what the Congress has prohibited are certain contract terms, and * * * the union's object is not an element of the unfair labor practice. To conclude that a contract term falling within the letter of § 8(e) properly falls within its prohibition, there must be either a finding that both parties understood and acquiesced in a secondary object.for the term, or a finding that secondary consequences within § 8(e)'s intendment would probably flow from the clause * * *.

While we are constrained by the circumstances of this case to hold that an illegal secondary consequence is perforce the result of enforcement of the contract clauses in question—there being no lawful primary purpose shown—we cannot say that there may not be other situations in which these clauses could be properly enforced without running afoul of § 8(e) if a proper primary purpose was demonstrated. It would therefore be too harsh to abrogate completely these contract provisions, thus in effect leaving the union without protection as to valid preservation of unit work. This result is even more forcefully called for by the fact that the Board has held this clause to be lawful under proper circumstances:

> As to Article II, Section 2, which limits subcontracting of sheet metal fabrication to fabricators paying the prevailing wage, that is building and construction wage rates, this article appears to be a lawful union standards clause, and no attempt has been made to show that standing alone the clause was ever designed for a purpose other than to protect regularly done unit work.

Local Union No. 26 of Sheet Metal Workers' Int'l Ass'n, 168 N.L.R.B. No. 118, 1968–1 CCH NLRB Decisions, ¶ 21,989 at 28,900 (1967).

## II. THE SECTION 8(b)(4)(i) AND (ii)(B) VIOLATIONS

Having upheld the Board's determination that the Union violated section 8 (e) in attempting to enforce the challenged contract clauses as to round pipe and adjustable elbows, it is not difficult for us to find further that the Union violated other parts of section 8 in attempting to enforce the illegal boycott. Section 8(b)(4) of the Act forbids a union:

> (i) * * * to induce or encourage any individual employed by any person engaged in commerce * * * to engage in * * * a refusal in the course of his employment to use * * * or otherwise, handle or work on any goods [or] materials or * * * to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce * * * where * * * an object thereof is—
>
> * * * * * *
>
> (B) forcing or requiring any person * * * to cease doing business with any other person * * *.

(29 U.S.C. § 158(b) (4) (i) and (ii) (B) (1964).)

█ The trial examiner found violations of these sections as a result of the following activity:

> Credited evidence in this record shows that Respondent Hamilton told Standard's employee, James Allen, that his employer would either have to get the "right material" on the job or he would take union employees off the job. * * * [This] statement to Al-

len constituted a clear inducement and threat that discipline or reprisals would be taken for installing the products in question and must be deemed [a] violation of 8(b)(4)(i) [and] (ii) (B). * * * Hamilton's statement to [Standard's employee] Newman is likewise violative. This remark * * * must be regarded as threatening or inducing employees of Standard * * * with an object of forcing Standard to cease doing business with the original supplier or manufacturer. * * *

* * * * * *

This record reveals that Respondent Hamilton also told Veach's Superintendent Scruggs * * * he could not use the materials made by the Charging Party and the members of Local 98 * * * could not install these products. Under all the particular circumstances involved in this case, I find this remark constitutes a violation of 8(b)(4)(ii) as a threat to cease doing business with the Charging Party.

(Trial Examiner's Decision, J.A. 115–17.) The fact that these statements were made was not contested by the Union; its contention was that they were designed to protect unit work in the valid enforcement of the contract clauses. In view of our holding that such enforcement violated section 8(e), we further find that there is substantial evidence in the record to justify the trial examiner's determination.

We held in *Teamsters Local 710, supra,* that "[i]f the jobs are fairly claimable by the unit, they may, without violating * * * § 8(b) (4) (A) or (B), be protected by provision for, and implementation of, no-subcontracting * * * clauses in the bargaining agreements." 118 U.S.App.D.C. at 291, 335 F.2d at 713. Where, as here, the jobs are not fairly claimable as unit work, however, the relevant sections are geared to "shielding unoffending employers * * * from pressures in controversies not their own." NLRB v. Denver Bldg. & Constr. Trades Council, 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951).

The activity in this case having been designed to enforce contract clauses in violation of section 8(e), the means used to effect that end must also be held invalid; a contrary holding would create an intolerable breach in the "shield" which protects unoffending employers.

### III. CONCLUSION

For the reasons noted above we hold that the Board properly found that the Union violated sections 8(e) and 8(b) (4) (i) and (ii) (B) of the National Labor Relations Act, and that the Board's order will therefore be enforced, subject to modifications consistent with the mandate of this opinion.

So ordered.

J. SKELLY WRIGHT, Circuit Judge (dissenting):

This case raises serious and difficult questions about the extent of the National Labor Relations Act's prohibition[1] against "secondary" activity by unions. In my judgment, and with deference, neither the majority opinion nor the National Labor Relations Board has provided adequate analysis of two problems: (1) the appropriate unit to be considered in drawing the line between permissible primary activity and proscribed secondary activity; and (2) what work is "fairly claimable" by unit employees. The present record does not afford an adequate basis on which to decide these issues in this case, and, accordingly, I would remand the case to the Board for further proceedings.

Local Union No. 98 has about 1,700 members and territorial jurisdiction in southeastern Ohio and Kentucky comprising about 65 counties. It negotiates collective bargaining agreements with several multi-employer associations of contractors engaged in the sheet metal and air conditioning business. On June

1. 29 U.S.C. § 158(b) (4) and (e) (1964).

7, 1967, Local 98 entered into an agreement with the Sheet Metal Contractors of Southern Ohio. The employers here, Standard Sheet Metal, Inc. and C. S. Veach, Inc., are signatories to the multi-employer agreement.[2] Clauses in the Southern Ohio contract prohibited employers from purchasing certain pipe and adjustable elbows unless the workers who made them were paid wages at least as high as the Southern Ohio workers.[3] The union refused to permit the employers to install Ajax Company pipes and elbows because Ajax's workers, although members of a sister union local, were not paid wages equivalent to those of Local 98. These clauses, and union enforcement of them, produced the current charges of violation of Sections 8(e) and 8(b)(4) of the Act.

## I

The Supreme Court has authoritatively delineated the line between permissible primary activity and proscribed secondary activity in National Woodwork Manufacturers Ass'n v. N.L.R.B., 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967), and Houston Insulation Contractors Ass'n v. N.L.R.B., 386 U.S. 664, 87 S.Ct. 1278, 18 L.Ed.2d 389 (1967). Earlier, we had formulated an almost identical dividing line. Meat & Highway

Drivers, Dockmen, etc., Local 710 v. N.L.R.B., 118 U.S.App.D.C. 287, 335 F.2d 709 (1964); Truck Drivers Union Local No. 413 v. N.L.R.B., 118 U.S.App.D.C. 149, 334 F.2d 539, cert. denied, 379 U.S. 916, 85 S.Ct. 264, 13 L.Ed.2d 186 (1964); Orange Belt District Council of Painters No. 48 v. N.L.R.B., 117 U.S.App.D.C. 233, 328 F.2d 534 (1964). *See also* Lewis v. N.L.R.B., 122 U.S.App.D.C. 18, 350 F.2d 801 (1965).

Broadly speaking, the primary-secondary division depends upon "whether, *under all the surrounding circumstances,* the Union's objective was preservation of work for [the unit's] employees, or whether the agreements and boycott were tactically calculated to satisfy union objectives elsewhere. * * * The touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer *vis-à-vis* his own employees," *National Woodwork, supra,* 386 U.S. at 644–645, 87 S.Ct. at 1268–1269 (emphasis added, footnotes omitted), in a legitimate attempt to prevent "encroachments on the [unit] work of the contract unit employees * * *." *Id.* at 617–618, 87 S.Ct. at 1254. We have phrased the test as whether the agreement and activity directly involve "jobs fairly claimable by the bargaining unit,"[4] whether they

2. Standard is apparently a member of the Sheet Metal Contractors of Southern Ohio and as such signed the collective bargaining agreement on June 7 along with the other members of the employers' association. Veach, however, does not appear to be a member of this association, and the record indicates that Veach ordinarily operates out of Lexington, Kentucky. When Veach began work as a contractor on a project in Wellston, Ohio, however, it signed the Southern Ohio agreement and paid its workers according to the Southern Ohio wage scale. The record does not indicate whether the workers employed by Veach were its employees from Lexington, Kentucky, or whether Veach hired local southern Ohio workers for the Wellston project.

The record reflects that, in addition to Standard, there were three other members of the Sheet Metal Contractors of Southern Ohio: Brush Electric Company, Inc.,

Homer Hoover, and H. T. Boggs Company, Inc.

3. The majority opinion incorrectly states that Local 98 sought to limit the pipes and elbows used to "those produced *at the job site* by employees working at the 'construction rate' * * *." (Emphasis added.) Testimony by union officials indicated that Local 98 would accept materials produced or manufactured anywhere; Local 98 only sought to require that the products used were made by workers who were paid wages at least equivalent to Local 98's wages. In fact, in the present case, Local 98's members eventually installed pipes and elbows made *off* the job site at a Columbus, Ohio plant where workers were paid an appropriate wage scale.

4. Meat & Highway Drivers, Dockmen, etc., Local 710 v. N.L.R.B., 118 U.S.App.D.C. 287, 291, 335 F.2d 709, 713 (1964).

seek to preserve those jobs for the bargaining unit,[5] and whether they are "germane to the economic integrity of the principal work unit."[6] In applying these criteria to "work standards" clauses, we have indicated that such clauses are "legitimate attempts by the union to protect and preserve the work and standards it has bargained for."[7]

The clause involved in the present case is, on its face, a union standards clause similar to those we have approved in other cases. It simply requires a contractor who chooses to purchase specified material rather than manufacture it himself to purchase it from employers who pay their employees wages at least equivalent to Local 98's wages. This type of clause may reasonably attempt to remove the economic incentive to the employer for contracting work out or buying prefabricated items and thus to preserve the work for the contracting employees. Indeed, the majority here does not disapprove such clauses. Rather the majority disapproves the present union standards clause as "secondary" because the fabricating work involved was not fairly claimable by Standard's and Veach's employees at the construction sites involved.

## II. THE RELEVANT UNIT

Primary-secondary analysis hinges on a determination of the employee group which the work preservation agreement may legally protect. Unless the relevant unit of employees is clearly established, it is impossible to decide whether a specific job has been customarily or traditionally done by them, or whether it is fairly claimable by them. Yet neither the majority nor the Board has analyzed what the appropriate "unit" is in the present case.

In considering this question, it is appropriate to emphasize the function which work preservation agreements serve. They allow employer and employee to bargain and mutually determine the extent to which work, necessary to the employer's business, is performed by his employees or is performed by others. Thus the Supreme Court has held that work preservation clauses are mandatory subjects of collective bargaining,[8] and, in *National Woodwork, supra,* that such clauses, assuming their scope is proper, may legally be enforced. It follows that the appropriate focus of work preservation agreements ought generally to be upon all employees in the bargaining unit. The union, bargaining on behalf of the unit's employees, may negotiate work preservation agreements which affect the unit in whole or in part.

In *Houston Insulation, supra,* the Supreme Court addressed one aspect of this "unit" problem. In that case, Armstrong Company had signed an agreement with one union local providing that the cutting and mitering of certain fittings be done in Armstrong's Houston shop. When Armstrong purchased prefabricated fittings, Armstrong's job site workers, the members of a sister local and not part of the same bargaining unit, refused to install the prefabricated materials. The Court held the union refusal was "primary" activity:

"A boycott cannot become secondary because engaged in by primary employees not directly affected by the dispute, or because only engaged in by some of the primary employees, and not the entire group. Since that situation does not involve the employer in a dispute not his own, his employees' conduct in support of their fellow employees is not secondary * * *."

386 U.S. at 669, 87 S.Ct. at 1281.

Where the employer is a member of a multi-employer bargaining association, it follows that the "primary" employees

5. *Ibid.*

6. District No. 9, International Ass'n of Machinists v. N.L.R.B., 114 U.S.App.D.C. 287, 290, 315 F.2d 33, 36 (1962).

7. Retail Clerks Union Local 770 v. N.L.R.B., 111 U.S.App.D.C. 246, 252, 296 F. 2d 368, 374 (1961).

8. Fibreboard Paper Products Corp. v. N.L.R.B., 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed. 2d 233 (1964).

are all the workers in the bargaining unit—all the employees of all the employers in the employers' association. In such a case, a boycott would not be secondary if engaged in by the employees of one employer to preserve work for the employees of another employer member of the multi-employer bargaining unit. This result would be particularly important and appropriate in an industry where workers shift jobs and employers frequently, and all have a strong interest in maintaining these job opportunities. Moreover, under *Houston Insulation,* the employer would not be involved "in a dispute not his own" since, as a member of the multi-employer bargaining unit, he is a direct party to the contract. In my view, the appropriate group of employees which a work preservation clause ought to protect will almost always be coextensive with the bargaining unit.[9]

In Lewis v. N.L.R.B., *supra,* this court pointed out the critical need to determine the proper unit in order to assess whether a union standards clause violated Section 8(e) of the Act. In fact, that case is quite similar in that respect to the present one. That case involved the coal industry which, like the Ohio construction industry, has a number of multi-employer bargaining units. The court noted that, for the purpose of primary-secondary analysis, it was theoretically possible to focus on employees of each individual employer, or on the employees of all employers in each multi-employer bargaining unit. On remand, the Board decided that the appropriate unit is the multi-employer bargaining unit.[10] Indeed, in the present case the trial examiner's decision, adopted by the Board, seems at times to assume, though none too clearly, that the relevant unit is indeed the multi-employer bargaining unit.[11]

In the present case, the relevant unit encompassed all the employees of the members of the multi-employer association, whether employed on site or off site, and whether employed in connection with the construction projects involved in the current dispute or on other projects. "[T]he concept of primary activity easily includes a boycott or strike by jobsite workers to protect the work of

9. It seems impossible to make any sense out of a limitation to a smaller unit than the one which the collective bargaining agreement covers. When employers join together in a multi-employer bargaining group, they do so to strengthen all the employers; and the multi-employer unit acts and bargains to further the interests of all the participating employers. Similarly, the union bargains for the rights of all the workers employed by all the employers. And particularly in an industry like the construction industry where workers move frequently from job to job and employer to employer, all the workers' interests relate even more directly to the employment practices of all the employers. The Supreme Court has approved multi-employer bargaining and has found evidence of congressional approval:

"The debates over the proposals [to outlaw multi-employer bargaining] demonstrate that Congress refused to interfere with such bargaining because there was cogent evidence that in many industries the multi-employer bargaining basis was a vital factor in the effectuation of the national policy of promoting labor peace through strengthened collective bargaining. * * *"

N.L.R.B. v. Truck Drivers Local Union No. 449 [Buffalo Linen], 353 U.S. 87, 95, 77 S.Ct. 643, 647, 1 L.Ed.2d 676 (1957). *See also* N.L.R.B. v. Brown, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965).

It may be that in certain cases an "area" concept would be appropriate for primary-secondary analysis. In the present case, Veach was not a member of the multi-employer bargaining unit. Instead the company signed the unit's contract when the company began work in Local 98's territory. *Cf.* N.L.R.B. v. Local Union No. 28, Sheet Metal Workers' Int. Ass'n, 2 Cir., 380 F.2d 827 (1967).

10. W. A. Boyle et al., 179 NLRB No. 80 (November 9, 1969).

11. *Compare* "The credited evidence in this record is most conclusive in showing that the employer members of the Sheet Metal Contractors—including Veach and Standard—normally and regularly purchase [the elbows and pipe] from mass production manufacturers," J.A. 109, *with* "the objectives of the [union] must also be preservation of work for the employees of Standard and Veach—employees of the Employer on whom pressure is being applied." J.A. 112.

offsite members within the same unit." [12] The present record reflects little or nothing about the off site operations of Standard or Veach or about the operations of the other members of the Southern Ohio association.[13] We do not know the degree to which union personnel frequently interchanged jobs, or the degree to which a decline in any local manufacturing would adversely affect bargaining unit jobs. None of this information appears in the record; in fact, we know nothing at all about the other signatories to the Southern Ohio agreement. I think this information is necessary to any determination of what work Local 98 could legitimately seek to preserve for its members.

### III. "FAIRLY CLAIMABLE" UNIT WORK

As I have indicated above, the main error made by the Board and the majority here in determining what work could properly be "preserved" by Local 98 for its members was the failure to focus clearly upon the multi-employer unit. But I am also troubled by the Board's and the majority opinion's approach to determining what work may be preserved by unit employees.[14] We have characterized the relevant test as work that is "fairly claimable" by unit employees.[15] To apply this test properly requires attention to more than what work specific employees have, as a matter of historical fact, performed. As the Supreme Court itself noted, the decision as to what work is "fairly claimable" by unit employees should be informed by "the remoteness of the threat of displacement by the banned product or services, the history of labor relations between the union and the employers who would be

boycotted, and the economic personality of the industry." *National Woodwork, supra,* 386 U.S. at 644 n.38, 87 S.Ct. at 1268. It seems clear that the Court did not intend the Board or the courts to focus exclusively upon the issue whether the work in question was "traditionally or customarily" performed by unit employees.

In my judgment, the Board must carefully analyze in each case whether the unit has a fair claim on the work in question. Such a claim must be appraised in light of the employees' interests in full utilization of their skills, both quantitatively and qualitatively. This analysis should, at a minimum, include careful analysis of the three factors listed by the Supreme Court. In addition, I would urge careful attention to whether the workers' training equipped them to perform the tasks in question, since employees have a strong interest in utilizing all their skills as well as in maintaining full employment. In addition, I think the Board must take note of the state of technological change occurring in an industry. If the bargaining unit moves into new areas of production, or if technological change produces new jobs within the union's jurisdiction, I see no reason to preclude union-management negotiation over the extent to which those jobs would be "preserved" for the employer's own employees. *Cf.* American Boiler Manufacturers Ass'n v. N.L.R.B., 8 Cir., 404 F. 2d 547, 551 (1968); Meat & Highway Drivers, Dockmen, etc., Local 710 v. N. L.R.B., *supra,* 118 U.S.App.D.C. at 291–292, 335 F.2d at 713–714.

In the present case the Board and the majority opinion focus almost exclusively upon the question whether the job

---

12. Note, Secondary Boycotts and Work Preservation, 77 Yale L.J. 1401, 1412 (1968).

13. As the majority points out, "some larger contractors manufactured these supplies, both for their own use and for sale to smaller contractors." Thus it appears, although the record is far from clear on this point, that the Sheet Metal Contractors of Southern Ohio, the multi-employer

bargaining unit which negotiated the contract here at issue, included employers who manufactured the relevant supplies. Thus some members of Local 98, included in the bargaining unit covered by the present contract, may have made the relevant supplies.

14. *See generally* Note, *supra* Note 12.

15. *See* Note 4, *supra.*

site employees of Veach and Standard "customarily and traditionally" performed the fabricating work in question. Since I believe this analysis applies a too restrictive formula to the wrong unit of employees, I cannot approve the Board's action on the present state of the record.

I respectfully dissent.