335 F.2d 709
 118 U.S.App.D.C. 287
 MEAT AND HIGHWAY DRIVERS, DOCKMEN, HELPERS AND MISCELLANEOUS
TRUCK TERMINAL EMPLOYEES, LOCAL UNION NO. 710, INTERNATIONAL
BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND
HELPERS OF AMERICA, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 18091.
 United States Court of Appeals District of Columbia Circuit.
 Argued Feb. 13, 1964.
Decided June 25, 1964.
 
 Mr. Bernard Dunau, Washington, D.C., for petitioner.
 Mr. Melvin J. Welles, Attorney, National Labor Relations Board, with whom Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Mrs. Janet Kohn, Attorney, National Labor Relations Board, were on the brief, for respondent.
 Messrs. Earl G. Spiker and P. Gordon Stafford, Washington, D.C., filed a brief on behalf of Swift & Company, as amicus curiae.
 Mr. Sidney A. Diamond, New York City, filed a brief on behalf of Armour & Co., as amicus curiae.
 Before BAZELON, Chief Judge, and WASHINGTON and WRIGHT, Circuit judges.
 WRIGHT, Circuit Judge:
 
 
 1
 The National Labor Relations Board has found that certain subcontracting clauses of petitioner's bargaining agreements and proposals are void under 8(e)[1] of the Labor Act, and that economic action to obtain their provisions violated 8(b)(4)(i)(ii)(A) and (B).[2] The subcontracting clauses involved will be referred to as the work allocation clause,[3] the union standards clause,[4] and the union signatory clauses.[5] By votes of 3-2, 4-1, and 5-0, respectively, the Board found these clauses to be secondary, and thus unlawful. The union petitions to review and set aside the Board's decison,[6] and the Board cross-petitions for enforcement.
 
 
 2
 The union here represents truck drivers employed by Wilson, Armour, Swift, and other Chicago packing companies who deliver meat and meat products in the Chicago area. The factual background of the dispute, as to which there is general agreement, is well stated in the separate opinion of Chairman McCulloch of the Board:
 
 
 3
 'For at least 20 years, meat packers in Chicago have agreed with (the union) that deliveries of meat products by truck within the Chicago area would be made directly by the packers, using their own equipment driven by employees represented by (the union). During most of this period, deliveries to customers in the Chicago area originated from the packers' plant in Chicago. Toward the end of the last decade, extensive changes in the distribution of meat products were effected as the major packers moved much of their slaughtering and processing operations outside of Chicago. The relocation of Swift, Armour, and Wilson, the three major packers, caused a sharp reduction in employment both of inside plant workers and of local drivers. Of about 330 truckdrivers employed by Swift, Armour, and Wilson at the beginning of the prior contract term in May 1958, only 80 were still employed 3 years later when negotiations began for a new agreement. Drivers employed by the packers continued to make deliveries from the remaining plant facilities in Chicago to customers within a 50 mile radius, but deliveries to customers within the same area were increasingly being made by over-the-road drivers whose runs originated from the packers' facilities outside the Chicago area. It was to the problem of recovering the jobs lost by the local drivers in the Chicago area and retaining those still performed there that the Union addressed itself in the 1961 negotiations.'
 
 I.
 
 4
 The union proposals for the bargaining agreement, which were found by the Board to violate 8(e), include the work allocation clause[7] which requires that all deliveries in Chicago, whether from within the city or from out of state, be made by local employees covered by the agreement. Under this provision the packing companies would be required to divide into two stages their shipments from out of state to Chicago consignees, terminating the interstate segment at the Chicago terminal.
 
 
 5
 The Board found that the delivery of out-of-state shipments to Chicago consignees was work historically performed, not by local drivers who were members of the bargaining unit, but by over-the-road drivers employed by interstate carriers. Thus, according to the Board, since such deliveries were not bargaining unit work, they could not be the subject of a clause which would allocate that work to the bargaining unit; to do so would require the packers to cease doing business, at least in part, with the interstate carriers, violating 8(e). In short, the Board says that the work allocation clause here provides for 'work acquisition,' not 'work preservation,' and consequently it is secondary in nature, falling outside the ambit of the cases declaring certain subcontracting clauses primary.[8]
 
 
 6
 Resolution of the difficult issue of primary versus secondary activity, as it relates to this case, involves consideration of two factors: (1) jobs fairly claimable by the bargaining unit, and (2) preservation of those jobs for the bargaining unit. If the jobs are fairly claimable by the unit, they may, without violating either 8(e) or 8(b)(4)(A) (B), be protected by provision for, and implementation of, no-subcontracting[9] or union standards[10] clauses in the bargaining agreements.[11] Activity and agreement which directly protect fairly claimable jobs are primary under the Act. Incidental secondary effects of such activity and agreement do not render them illegal.[12] Thus the 'cease doing business' language in 8(e) cannot be read literally[13] because inherent in all subcontracting clauses, even those admittedly primary, is refusal to deal with at least some contractors.[14]
 
 
 7
 Applying these principles to the work allocation clause here, we find that delivery in the Chicago area, irrespective of origin of the shipment, is work fairly claimable by the union. It has been said 'that a union has always been free to bargain for the expansion of the employment opportunities within the bargaining unit.' Comment, 62 MICH.L.REV. 1176, 1190 (1964). The work here claimed is of a type which the men in the bargaining unit have the skills and experience to do. It would be difficult to deny that '(a) clause covering non-traditional work may be just as consecrated to the primary objective of bettering the lot of the bargaining unit employees and just as foreign to the congressional purpose for section 8(e) as those clauses involving only the work traditionally done within the bargaining unit.' Id. at 1189.
 
 
 8
 Moreover, in the case before us, we have not work acquisition but work recapture. It is true, as the Board finds, that in the past out-of-state shipments have on occasion been delivered to consignees in the Chicago area by the interstate carrier directly, in spite of the fact that the expiring bargaining agreement with the employers here covered deliveries 'to a distance not exceeding 50 miles from the Chicago Stock Yards * * *.' But when the expiring agreement was originally entered into, practically all of the packing houses from which deliveries to the Chicago area were made were located in Chicago. Consequently, the union had no concern with the occasional shipment into the area via interstate carrier.
 
 
 9
 During the period of the expiring agreement, however, there was a dramatic change in the manner in which the employers here conduct their business. Most of the packing houses have been moved out of Chicago, so that now most of the shipments for the area out-of-state shipment. It is understandable, therefore, that the union, in bargaining for a new agreement, turned its attention to these out-of-state shipments in an effort to require that the last leg thereof be made by local drivers. Thus the union, under its new proposal, is attempting not only to retain jobs for local drivers, but to recapture some of the work lost by the movement of packing houses out of Chicago. Unquestionably, this work is fairly claimable by the local drivers, and their union's efforts in their behalf in that direction fall easily within the legitimate area of collective bargaining. We agree with Chairman McCulloch, joined by Member Brown, in dissenting from the opinion of the Board on this point:
 
 
 10
 'Deliveries to consignees in the Chicago area, regardless of origin, can justifiably be considered to be work of the employees within (the union's) unit. Even if it had never been customarily performed by unit members when it was part of an interstate haul, it is nevertheless so closely allied-- and is in part identical-- to the local deliveries previously recognized for almost 20 years to be unit work as to make bargaining about it mandatory. To hold otherwise is to say that a union may not seek to bargain with an employer either about the quantum of work, or the qualifications of its members to perform closely related work, whenever technological changes or mere changes in methods of distribution are to be effected.'
 
 
 11
 Since we view this attempt on the part of the union to maintain and regain the local delivery jobs for members of the bargaining unit as a typical primary activity, we hold the work allocation clause valid under 8(e), and economic activity to obtain it lawful under 8(b)(4).
 
 II.
 
 12
 The union proposal also contained a union standards subcontracting clause which read:
 
 
 13
 'In the event that the Employer does not have sufficient equipment at any given time to deliver his then current sales or consignments within the Chicago city limits, it may contract with any cartage company whose truckdrivers enjoy the same or greater wages and other benefits as provided in this agreement for the making of such deliveries.'[15]
 
 
 14
 The Board's basic reason for finding the subcontracting clause illegal is its view that a work standards clause accords 'the Union a veto over the decision as to who may receive the signatory employer's subcontractors' by defining 'the persons with whom the signatory employer may and may not do business.' This view, given primary place in the Board's decision and utilized as the major argument in its brief on this point, follows the distinction that clauses which regulate 'who' may receive subcontracting work are secondary, while only clauses which regulate 'when' subcontracting occurs are primary. This court has rejected that distinction in a line of cases cited in the margin.[16] We have considered the matter once more, and re-adopt the principles of these cases.
 
 
 15
 An alternative argument advanced in the Board's brief is one stated in a concurring opinion of the Board, though not in its majority opinion. This view assumes that an overflow cause and a work standards clause would each, separately, be lawful, but challenges the combination of the two, as in the clause here, with the following argument: When combined, the work standards clause by definition covers only overflow work that could not be done by unit employees. Thus the clause attempts to regulate the conditions for work which is not in competition with unit work, and therefore could not possibly benefit unit members.
 
 
 16
 This argument would have more force if the standards clause were combined with a full employment clause rather than an overflow clause. An overflow clause may come into operation due to attrition or obsolescence of trucks, failure to buy or to lease new equipment, or the like. If for any of these reasons the employer should have an equipment shortage, under this contract he could subcontract work which his employees could do, even though some of his employees stood idle. Thus subcontracting of unit work is possible under this clause.
 
 
 17
 To protect unit work by partially deterring such employer conduct, this clause would at least remove from the employer the temptation of cheap labor through substandard contractors. This is a usual function of a standards clause, as discussed in our prior opinions. We need not assume that an employer would use such a tactic as here discussed; it is enough that the union could fear it, and seek such a clause to prevent it.[17]
 
 
 18
 An additional reason for the Board's decision, not argued to us in the Board's brief, but given as supporting grounds ('moreover') in the Board's opinion, is that the union's object in bargaining for this clause was to aid union members generally, rather then members of the unit.[18] We agree that such an object is secondary. See Orange Belt District Council of Painters No. 48 v. N.L.R.B., supra Note 10 (Part II).
 
 
 19
 But a finding as to the object of one party to the contract is insufficient (standing alone) to support the conclusion that the contract itself violates 8(e). Under 8(e), what the Congress has prohibited are certain contract terms, and-- as contrasted with 8(b)(4)[19] -- the union's object is not an element of the unfair labor practice. To conclude that a contract term falling within the letter of 8(e) properly falls within its prohibition,[20] there must be either a finding that both parties understood and acquiesced in a secondary object for the term,[21] or a finding that secondary consequences within 8(e)'s intendment[22] would probably flow from the clause, in view of the economic history and circumstances of the industry, the locality, and the parties.
 
 
 20
 Since, in deciding this case, the Board did not have the benefit of our recently decided cases on work standards clauses, and since it is uncertain whether it would have concluded as it did had it applied the proper standard, we will remand this issue to the Board for reconsideration in the light of the principles announced in this case and the cases herein relied upon.
 
 III.
 
 21
 Certain contracts long in force between the union and some of the Chicago packers contain the following union signatory clause:
 
 
 22
 'Livestock, meat and meat products for delivery by truck to a distance not exceeding 50 miles from the Chicago Stock Yards, whether to final destination or point of transfer, shall be delivered by the Company in their own equipment except when there is a lack of equipment at individual plants or branches, and than all effort will be made to contract a cartage company who employs members of Local No. 710. * * *'[23]
 
 
 23
 While the work allocation features of this paragraph are valid, the provision requiring or encouraging a boycott of cartage companies who do not have union contracts is a violation of 8(e). To make the selection of subcontractors turn upon union approval bears only a tenuous relation to the legitimate economic concerns of the employees in the unit, and enables the union to use secondary pressure in its dispute with the subcontractors. We therefore hold this provision void under 8(e).[24]
 
 
 24
 With reference to this union signatory clause, the union raises the issue of the scope of the ban. The Board found objectionable only the provision 'and then all effort will be made to contract a cartage company who employs members of Local No. 710.' Nevertheless, its order ran against the entire clause. The union argues that the objectionable portion should be excised, leaving the remainder of the clause intact as a viable promise capable of enforcement in keeping with the sense of the contract. Excision of the objectionable language would give the employers greater latitude under the contract. Thus excision should be acceptable to them. And the union, certainly, would rather see the language deleted than lose the benefit of the remainder of the clause. Deletion, then, would leave the total collective bargaining agreement in a state close to the actual agreement of the parties. And deletion would satisfy totally the requirements of 8(e). Accordingly, we hold that the Board should not invalidate more of the contract than is unlawful, 'where the excess may be severed and separately condemned as it can here.' National Labor Relations Board v. Rockaway News Co., 345 U.S. 71, 79, 73 S.Ct. 519, 524, 97 L.Ed. 832 (1953).[25]
 
 IV.
 
 25
 We also note that a temporary agreement in force for a short period between the union and certain packers contained clauses which in terms restricted shipments to firms signatory to collective bargaining agreements with the union or certain affiliated Teamster unions.[26] For the reasons stated above, such clauses are void under 8(e).[27] Subcontracting clauses cannot be used as leverage to require secondary firms to sign union contracts. Requiring them, on pain of boycott, to sign contracts with designated unions compounds the illegality. The power of the nationwide network of Teamster unions cannot be mobilized against an employer in such a manner, for the purpose of the Congress in enacting 8(e) was to outlaw such secondary pressures. Though the clauses in question are not now in force, their validity was fully litigated below, and the imposition of clauses of such flagrant illegality raises the possibility that they may be revived unless enjoined. See Labor Board v. Mexia Textile Mills, 339 U.S. 563, 567, 70 S.Ct. 833, 94 L.Ed. 1067 (1950), and cases there cited. To the extent that the Board decree is so designed, it will be enforced.
 
 V.
 
 26
 The Board also made additional unfair labor practice findings on the basis of the union's strike to achieve the clauses deemed prohibited by 8(e). The Board found that, since the disputed clauses were intended to restrict work to union members, they had the ancillary purpose of requiring the truck drivers who wished to be able to do such work to join the union. In reference to the union signatory clauses discussed above, this conclusion has merit. As limited to those clauses, the Board's decree will be enforced. Whether the union's actions with respect to the work standards clauses constituted an unfair labor practice will be remanded to the Board for decision in light of this opinion. See Part II, supra, especially Notes 18 and 19.
 
 
 27
 Since we enforce the Board's order only in part, its extension to cover union relations with 'any other employer' is unjustified. The extension to cover pressure to join 'any other labor organization' is justified, however, because the evidence shows that the union's illegal activity was intended, not merely to aid this local, but affiliated Teamster organizations as well.
 
 
 28
 Enforced in part; set aside in part; remanded in part.
 
 
 
 [1]
 73 Stat. 543, 29 U.S.C. 158(e)
 
 
 [2]
 73 Stat. 542-543, 29 U.S.C. 158(b)(i)(ii)(A) and (B)
 
 
 [3]
 This clause provides, in pertinent part, that truck shipments by each meat packer to its customers within Chicago be made from a Chicago distribution facility of the employer 'by employees covered by this agreement.' This clause, and the one referred to in Note 4, infra, were included in a special agreement between the union and the packers which deferred bargaining and a strike until final determination of the lawfulness of the clauses by the Board and the court
 
 
 [4]
 This clause provides, in pertinent part, that in the event the packer does not have sufficient equipment to make all local deliveries itself, 'it may contract with any cartage company whose truckdrivers enjoy the same or greater wages and other benefits as provided in this agreement for the making of such deliveries.'
 
 
 [5]
 One such union signatory clause required that both shipments into Chicago, and local overflow work, be made only by carriers 'party to the Central States or other Over-The-Road Teamster Motor Freight Agreement.' The union acquiesces in the Board's finding that this clause violates 8(e). However, since the clause was not part of the definitive union bargaining proposal, the union contends that the issue of its validity is moot and its litigation without useful purpose. This clause was included in the agreements signed with 17 smaller packers which were in force only during the first week of June, 1961
 Based on its finding that this clause would require self-employed truck drivers to join the union, the Board concluded that the union's strike during the first week of June 'was also for an object of forcing or requiring self-employed truckers to join the Union in violation of Section 8(b)(4)(i)(ii)(A) of the Act.' The union contends that there was no evidence to support this finding.
 Another clause, continued into the collective bargaining agreement from prior contracts, provided that in the event of insufficient equipment for the packers to handle all deliveries, 'all effort will be made to contract a cartage company who employs members of Local No. 710.' This clause was also found to violate 8(e). The union acquiesces in the finding of the invalidity of this clause, but asks that it be severed from the collective bargaining agreements, letting related clauses-- legal in themselves-- stand unaffected.
 
 
 [6]
 The union also contests the Board's extension of its order to cover action relating to 'any other employer' and 'any other labor organization.'
 
 
 [7]
 See Note 3, supra
 
 
 [8]
 See, e.g., Bakery Wagon Drivers & Salesmen, Local U. No. 484 v. N.L.R.B., 116 U.S.App.D.C. 87, 321 F.2d 353 (1963); District No. 9, International Ass'n of Machinists v. N.L.R.B., 114 U.S.App.D.C. 287, 315 F.2d 33 (1962); see also Retail Clerks Union Local 770 v. N.L.R.B., 111 U.S.App.D.C. 246, 296 F.2d 368 (1961)
 
 
 [9]
 Ibid
 
 
 [10]
 Orange Belt District Council of Painters No. 48 v. N.L.R.B., 117 U.S.App.D.C. 233, 328 F.2d 534 (1964), and cases therein cited; Truck Drivers Union Local No. 413 v. N.L.R.B., 118 U.S.App.D.C. , , 334 F.2d 539, 548 decided April 9, 1964
 
 
 [11]
 The union recognition subcontracting clauses in the bargaining agreement, however, are illegal. See Building and Construction Trades Council, etc. v. N.L.R.B., 117 U.S.App.D.C. 239, 328 F.2d 540 (1964); Bakery Wagon Drivers & Salesmen, Local U. No. 484 v. N.L.R.B., supra Note 8
 
 
 [12]
 Cf. Local 761, International Union of Electrical, Radio and Machine Workers v. Labor Board, 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961)
 
 
 [13]
 '* * * Literalism is not the touchstone for construction of section 8(e). The question rather is whether a particular agreement is fairly within the intendment of Congress to do away with the secondary boycott.' District No. 9, International Ass'n of Machinists v. N.L.R.B., supra Note 8, 114 U.S.App.D.C. at 290, 315 F.2d at 36
 In 8(e), as has been said in regard to 8(b)(4)(B), the phrase 'cease doing business with any other person, must be read with the implicit condition that * * * (it) be accomplished by secondary, but not primary means. Within in the area of primary conduct a union may lawfully persuade all persons * * * to cease doing business with the struck employer.' Schultz Refrigerated Service, Inc., 87 N.L.R.B. 502, 504 (1949); see also Local 761, International Union of Electrical, Radio and Machine Workers v. Labor Board, supra Note 12, 366 U.S. at 672, 81 S.Ct. 1288.
 
 
 [14]
 See cases cited in Notes 8 and 10, supra; see also Cox, The Landrum-Griffin Amendments to the National Labor Relations Act, 44 MINN.L.REV. 257, 273 (1959)
 
 
 [15]
 See Note 4, supra. We take it that the phrase 'same or greater wages and other benefits' requires only that total cost to the employer be the same or greater. Thus the temptation of cheap labor is removed without requiring details identical with the union contract
 
 
 [16]
 Retail Clerks Union Local 770 v. N.L.R.B., supra Note 8; District No. 9, International Ass'n of Machinists v. N.L.R.B., supra Note 8; Orange Belt District Council of Painters No. 48 v. N.L.R.B., supra Note 10; Building and Construction Trades Council, etc. v. N.L.R.B., supra Note 11; Truck Drivers Union Local No. 413 v. N.L.R.B., supra Note 10; cf. Local 24 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America Union v. Oliver, 358 U.S. 283, 79 S.Ct. 297, 2 L.Ed.2d 312 (1959), explained, United States v. Drum, 368 U.S. 370, 382 n. 26, 82 S.Ct. 408, 414, 7 L.Ed.2d 360 (1962)
 Member Brown of the Board, who relied on Retail Clerks Union Local 770 v. N.L.R.B., supra Note 8, dissented from the Board's decision that the provision here involved violated 8(e). He said:
 'In thus limiting the class of persons to whom the assigned work of the contract unit may be subcontracted, the Union's purpose, so far as this record reveals, is not to limit the employer in the persons with whom he does business in order to further a dispute at another employer's establishment, or to protest objectionable conditions at another employer's establishment, or the improve the conditions of the employees of another employer. Rather, the Union's objective was to accommodate the business needs of the employer while at the same time protecting the welfare of employees in the packer bargaining unit it represents.
 '* * * (This clause) recognizes realistically that situations sometimes do arise when the packer may have drivers of his own available but insufficient equipment to carry out his operations. In such situations, the (clause) would permit the packer to contract with a cartage company; but only when the cartage company maintains the same or better labor standards. The (clause) thus discourages the packer's use of a cartage company as a device for undermining the work and standards which the packer had agreed to maintain for his employees. Accordingly, the (clause) serves both the packer's interest in flexibility and the Union's interest in preventing that flexibility from undercutting the job security of the packer's own employees through subcontracting their work for performance under substanard conditions.
 '* * * As noted previously, my colleagues would agree that a no-subcontracting agreement to preserve the work of the bargaining unit employees is lawful even though it absolutely precludes subcontracting of the work to other employers. Reason would dictate a similar result here in view of the similar object of the clause under consideration and where incidental effects are even less restrictive. * * *'
 
 
 [17]
 In both briefs and oral argument, the parties have discussed the question of the feasibility of leasing extra trucks when there is an equipment shortage. We note that neither the Trial Examiner nor the Board took evidence or made findings on this point
 
 
 [18]
 In its majority opinion, immediately after finding the union's object to be aid of its members generally, rather than aid to members of the unit, the Board continued: 'We do so, not only for the reasons set forth above, but because the clause * * * applies to * * * delivery of products originating in plants outside the Chicago area * * *.' This branch of the Board's reasoning must be rejected for the reasons set out in Part I of this opinion
 
 
 [19]
 Of course, the action of the union itself, taken with a prohibited secondary object, may violate such other sections of the Act as 8(b)(4)
 
 
 [20]
 See Notes 12-14, supra, and accompanying text
 
 
 [21]
 The object of the contract, that is, the object acquiesced in by the parties as given expression in the contract, gives meaning to its terms
 
 
 [22]
 See Orange Belt District Council of Painters No. 48 v. N.L.R.B., supra Note 10 (Part II)
 
 
 [23]
 See Note 5, supra
 
 
 [24]
 Building & Construction Trades Council v. N.L.R.B., supra Note 11; Bakery Wagon Drivers & Salesmen, Local U. No. 484 v. N.L.R.B., supra Note 8; District No. 9, International Ass'n of Machinists v. N.L.R.B., supra Note 8; Retail Clerks Union Local 770 v. N.L.R.B., supra Note 8
 
 
 [25]
 Truck Drivers Union Local No. 413 v. N.L.R.B., supra Note 10, 334 F.2d at p. 549. See Local Lodge No. 1417, Int. Ass'n of Machinists v. N.L.R.B., 111 U.S.App.D.C. 235, 236-237, 296 F.2d 357, 358-359 (1961); cf. N.L.R.B. v. Amalgamated Lithographers of America (Ind.), 9 Cir., 309 F.2d 31 (1962), cert. denied, 372 U.S. 943, 83 S.Ct. 936, 9 L.Ed.2d 968 (1963); see also Manning v. Elliott, 9 App.D.C. 71, 81 (1896); RESTATEMENT, CONTRACTS 607, comment a
 Whether renegotiation of part or all of a contract would be proper after such deletion is for the Board, in the first instance, to decide.
 
 
 [26]
 See Note 5, supra
 
 
 [27]
 See cases cited Note. 24, supra