**SHEET METAL WORKERS INTERNATIONAL ASSOCIATION, LOCAL UNION NO. 223, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 72–1787.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 4, 1973.

Decided May 10, 1974.

William T. Coleman, Jr., Miami, Fla., with whom Seymour A. Gopman, Miami Beach, Fla., was on the brief, for petitioner.

William Gaus, Atty., N.L.R.B., for respondent. John S. Irving, Deputy Gen. Counsel, N.L.R.B., with whom Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Acting Asst. Gen. Counsel, and Abigail Cooley Baskir, Atty., N.L.R.B., were on the brief for respondent. Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., at the time the brief was filed,

also entered an appearance, for respondent.

Before ROBB and WILKEY, Circuit Judges, and ROBERT VAN PELT *, United States Senior District Judge for the District of Nebraska.

WILKEY, Circuit Judge:

This is a petition for review of an order of the National Labor Relations Board instructing the petitioner, Sheet Metal Workers' Local 223 (Local 223), to cease and desist from maintaining a labor contract clause that the Board found violative of section 8(e) of the National Labor Relations Act (NLRA).[1] We have concluded that the trial examiner and the NLRB failed to resolve or adequately to consider factors that are central to the evaluation of any labor-management agreement under section 8(e). Therefore, the record compiled in this proceeding cannot support the Board's finding of an 8(e) violation and its corrective order.

## I. BASIS FOR THE CONTROVERSY

At issue here are provisions of the Standard Form of Union Agreement signed by Local 223 and Gelfand Roofing Company (Gelfand), a roofing contractor and a charging party in the Board proceedings. The same agreement governs relations between Local 223 and the Florida East Coast Sheet Metal Contractors Association, a multi-employer bargaining association and an intervenor below.

The provisions in controversy, article II, section 2 and article VIII, section 2,[2] are fairly common union standards clauses. On their face, these clauses seem designed to remove the economic incentive the employer (Gelfand) might otherwise have to deprive Local 223 members of work on its construction projects by subcontracting out sheet metal work or purchasing prefabricated sheet metal items at less than union rates.[3] However, the trial examiner for the Board found that the provisions

---

* Sitting by designation pursuant to Title 28, U.S.C. § 294(d).

1. 29 U.S.C. § 158(e) (1970). The Board also found violations of sections 8(b)(4)(i) and (ii)(B), 29 U.S.C. § 158(b)(4)(i)–(ii)(B) (1970), which are not challenged on appeal, and are thereby enforced.

2.              "ARTICLE II
  \*        \*        \*        \*        \*

"SECTION 2. Subject to other applicable provisions of this Agreement, the Employer agrees that when subcontracting for perfabrication [sic] of materials covered herein, such prefabrication shall be subcontracted to fabricators who pay their employees engaged in such fabrication not less than the prevailing wage for comparable sheet metal fabrication, as established under provisions of this Agreement.
  \*        \*        \*        \*        \*
              "ARTICLE VIII
  \*        \*        \*        \*        \*

"SECTION 2. On all work specified in Article I of this Agreement, fabricated and/or assembled by journeymen sheet metal workers and/or apprentices within the jurisdiction of this Union, or elsewhere, for erection and/or installation within the jurisdiction of any other Local Union affiliated with Sheet Metal Workers' International Association, whose established wage scale is higher than the wage scale specified in this

498 F.2d—44

Agreement, the higher wage scale of the job site Union shall be paid to the journeymen employed on such work in the home shop or sent to the job site." Joint App. at 79, 80.

3. See Meat and Highway Drivers Local 710 v. NLRB, 118 U.S.App.D.C. 287, 294, 335 F.2d 709, 716 (1964); Sheet Metal Workers Local 26 (Reno Employers Council), 168 N.L.R.B. 893, 899 (1967); Comment, Subcontracting Clauses and Section 8(e) of the National Labor Relations Act, 62 Mich.L.Rev. 1176, 1190 (1964).

General Counsel for the Board was willing to concede that the provisions are valid on their face. Trial Examiner's Decision at 5, Joint App. at 40. However, the Board stated:

In view of our ultimate conclusion here that article II, section 2, and article VIII, section 2, of the "Standard Form of Union Agreement" entered into between Respondent and Gelfand Roofing Company, as administered, maintained, enforced, and given effect to, are violative of Section 8(e), we need not, and do not, pass on the validity under Section 8(e) of such contract provisions on their face.

NLRB Decision and Order at 2 n. 3, Joint App. at 66 (reported as 196 N.L.R.B. No. 112, 3 April 1972). Use of union standards clauses as mechanisms for work preservation has been upheld in Retail Clerks Local 1288

"were applied and sought to be enforced by [Local 223] in a manner which violates Section 8(e) of the Act." [4] The trial examiner made this determination on the basis of a series of fact-findings and legal conclusions summarized below.

First, the trial examiner found that prior to May 1970, when the agreement was signed by Gelfand and Local 223, Gelfand had "no contract with [Local 223] and employed members of the latter only on very rare occasions," [5] and further, Gelfand then had no facilities or equipment for fabricating the sheet metal items it used on its roofing projects. It had always purchased such items from distributors which were not under contract with any local of the Sheet Metal Workers' International. As to implementing the contract clauses, the trial examiner further found that in the fall of 1970, after Gelfand had contracted with Local 223, agents of the union informed Gelfand that on its Centex-Winston condominium project, it could not use prefabricated sheet metal items, specifically stucco stops and gravel stops, that did not bear union labels. The agents backed their statements with threats of monetary penalties, work stoppages, and grievance filings. Subsequently, Union business manager Wallace Strong solicited and received from Gelfand a check for the difference between the cost of some of the items purchased and the wages Gelfand would have paid had the items been fabricated by union members. The object of Local 223's conduct, the trial examiner determined, was a secondary one: to boycott goods produced by nonunion employers. On the basis of these findings, the trial examiner concluded that Local 223 had violated section 8(b)(4)(ii)(B) of the NLRA [6] by "threatening, coercing, and restraining . . . Gelfand . . . to cease using, handling, or otherwise dealing in the products of . . . producers of metal products not bearing a union label . . . ." [7] Local 223 challenges neither this conclusion as to the union's specific actions nor the related portion of the Board's cease and desist order in this court.

With respect to the charge that Local 223 had violated section 8(e), the examiner made the following statement:

Having found and concluded that [Local 223's] pressure on Gelfand was secondary in character, if [sic] follows that Article II, Section 2, and Article VIII, Section 2, of the contract between [Local 223] and Gelfand, set forth above, were applied and sought to be enforced by [Local 223] in a manner which violates Section 8(e) of the Act. I so find and conclude. Cincinnati Sheet Metal & Roofing Company, 174 NLRB No. 22, enfd. as modified [140 U.S.App.D.C. 83] 433 F.2d 1189 (C.A.D.C.); Cincinnati Sheet Metal Roofing Company, 174 NLRB No. 125, enfd. 425 F.2d 730 (C.A. 6). In both cases the identical contractual provisions involved in the instant case were found violative of Section 8(e) because they were improperly implemented. [8]

Other findings by the trial examiner concerned Local 223's relations with Union Air Conditioning, Inc. (Union Air) and United Sheet Metal Company (United), both of which are members of the Florida East Coast Sheet Metal Contractors Association and therefore subject to the Standard Form of Union Agreement. The examiner found that agents of Local 223 had pressured Union Air and United to cease buying prefabricated air conditioning filter racks that did not bear union labels. In addition, he determined that the Local had instructed its members who were employed by Union Air

---

v. NLRB, 129 U.S.App.D.C. 92, 95, 390 F.2d 858, 861 (1968), and Orange Belt District Council of Painters No. 48 v. NLRB, 117 U.S.App.D.C. 233, 328 F.2d 534 (1964).

4. Trial Examiner's Decision at 24, Joint App. at 59.

5. *Id.* at 5, Joint App. at 40.

6. 29 U.S.C. § 158(b)(4)(ii)(B) (1970).

7. Trial Examiner's Decision at 24–25, Joint App. at 59–60.

8. *Id.* at 24, Joint App. at 59.

and United not to install nonunion label filter racks until their employers had paid the Local the difference between the purchase price of the filter units and the projected cost of fabricating the units at union wage rates. Although the examiner had received evidence on the question of whether filter racks were customarily fabricated by employees of Union Air, United, and other contractors, he made no specific finding on this issue. Rather, he again determined that Local 223's object was to boycott items manufactured by nonunion employers. Thus, he concluded that Local 223 had violated sections 8(b)(4)(i) and (ii)(B) [9] by its conduct with respect to Union Air and United.[10] Since the issue was not before him, the trial examiner did not decide whether Local 223 had violated section 8(e) of the NLRA in its contractual relations with United and Union Air.

Relying on the trial examiner's findings, with some modifications not material here, the Board ordered Local 223 to cease and desist from the conduct that had been found to violate sections 8(b)(4)(i) and (ii)(B). The Board's order is challenged here to the extent that it commands Local 223 to cease and desist from "[m]aintaining, enforcing, or giving effect to article II, section 2, or article VIII, section 2, of the collective-bargaining agreement entered into by [Local 223] and Gelfand . . . insofar as these clauses are applied to prohibit use of nonunion label products." [11]

## II. SCOPE OF SECTION 8(e) AND THE APPLICABLE CASE LAW

■ The language of section 8(e) of the NLRA is very broad.[12] On its face, it seems to prohibit *any* contractual provision under which an employer agrees "to cease or refrain" from dealing in the products of some third party. But in enacting section 8(e), Congress intended merely to close a loophole in the secondary boycott provisions of the NLRA.[13] Prior to 1959, a union and employer could legally contract to boycott the products of third parties, so long as the union did not enforce the so-called "hot cargo" agreement by means of conduct violating section 8(b)(4)(A) (now 8(b)(4)(B)).[14] In closing this loophole,

9. 29 U.S.C. § 158(b)(4)(i)–(ii)(B) (1970).

10. Trial Examiner's Decision at 24–25, Joint App. at 59–60.

11. NLRB Decision and Order at 9–10, Joint App. at 73–74.

12. 29 U.S.C. § 158(e) (1970):
It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void: *Provided,* That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work: *Provided further,* That for the purposes of this subsection and subsection (b)(4)(B) of this section the terms "any employer", "any person engaged in commerce or an industry affecting commerce", and "any person" when used in relation to the terms "any other producer, processor, or manufacturer", "any other employer", or "any other person" shall not include persons in the relation of a jobber, manufacturer, contractor, or subcontractor working on the goods or premises of the jobber or manufacturer or performing parts of an integrated process of production in the apparel and clothing industry: *Provided further,* That nothing in this subchapter shall prohibit the enforcement of any agreement which is within the foregoing exception.

13. For a comprehensive discussion of the legislative history of section 8(e) see National Woodwork Mfrs. Ass'n v. NLRB, 386 U.S. 612, 635–644, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967).

14. Ch. 120, § 8(b)(4)(A), 61 Stat. 141 (1947), as amended, 29 U.S.C. § 158(b)(4)(B) (1970). This loophole was exposed by the Supreme Court's *Sand Door*

Congress intended that the scope of section 8(e) be no broader than that of section 8(b)(4)(A).[15] Thus, section 8(e) reaches only labor-management agreements that have *secondary* objectives, *not* those with the *primary purpose* of affecting relations between the union and the contracting employer.[16]

■ This background makes it clear that the fundamental concept in analyzing a contractual provision under section 8(e) is the primary-secondary distinction. A helpful discussion of this distinction was supplied by the Third Circuit in A. Duie Pyle, Inc. v. NLRB:

> If the object of the agreement is to benefit the employees of the bargaining unit represented by the union, it is "primary" and in such event does not fall within the proscription of § 8(e), whereas if the object is the application of pressure on an outside employer in order to require him to accede to union objectives it is "secondary" and within the prohibition of § 8(e).[17]

In National Woodwork Manufacturers Association v. NLRB,[18] the Supreme Court supplied more detailed criteria for determining on which side of the primary-secondary line a contractual provision allegedly violative of section 8(e) falls. The central inquiry is "whether, under all the surrounding circumstances, the Union's objective was preservation of work . . . or whether the agreements . . . were tactically calculated to satisfy union objectives elsewhere."[19] As surrounding circum-

stances, the Court identified "the remoteness of the threat of displacement by the banned product or services, the history of labor relations between the union and the employers who would be boycotted, and the economic personality of the industry."[20] The Court went on to say, "The touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer *vis-à-vis* his own employees."[21]

The factual setting of *National Woodwork* was that pursuant to a provision of a collective-bargaining agreement covering carpentry work on a construction project,[22] the union refused to hang doors prefabricated away from the jobsite. The Court first analyzed the contract provision itself and concluded that since its "objective . . . was preservation of work traditionally performed by the jobsite carpenters,"[23] the provision did not violate section 8(e). Then the Court proceeded to evaluate the union's maintenance of the provision and reasoned that since union members had refused to install all prefabricated doors, whether union-made or nonunion, the union's conduct had the primary purpose of preserving door fabrication work for carpenters at the jobsite and did not violate section 8(b)(4)(B). Thus, the Court's analysis clearly proceeded in two *discrete* stages: (1) Was the disputed contractual provision *per se* designed to achieve a secondary objective, in which case it would violate section 8(e)? (2) Was the union's conduct in implementing that provision directed at a second-

decision, Carpenters Local 1976 v. NLRB, 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958).

15. National Woodwork Mfrs. Ass'n v. NLRB, 386 U.S. 612, 635, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967).

16. 386 U.S. at 635, 639. *See also* Meat and Highway Drivers Local 710 v. NLRB, 118 U.S.App.D.C. 287, 291–292, 335 F.2d 709, 713–714 (1964) ; Lesnick, Job Security and Secondary Boycotts : The Reach of NLRA §§ 8(b)(4) and 8(e), 113 U.Pa.L.Rev. 1000, 1009–15 (1965).

17. 383 F.2d 772, 776 (1967).

18. 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967).

19. *Id.* at 644.

20. *Id.* n. 38.

21. *Id.* at 645.

22. The provision read : "No member of this District Council will handle . . . any doors or transoms which have been fitted prior to being furnished on job . . . ." *Id.* at 615 n. 2.

23. *Id.* at 646.

ary objective in violation of section 8(b)(4)(B)?[24]

Meat and Highway Drivers Local 710 v. NLRB,[25] a case decided in this Circuit that in many respects anticipated *National Woodwork,* further elaborates the primary-secondary distinction in the context of section 8(e) controversies. Speaking through Judge Wright, we there stated:

> Resolution of the difficult issue of primary *versus* secondary activity, as it relates to this case, involves consideration of two factors: (1) *jobs fairly claimable* by the bargaining unit, and (2) *preservation* of those jobs for the bargaining unit. If the jobs are fairly claimable by the unit, they may, without violating either § 8(e) or § 8(b)(4)(A) or (B), be protected by provision for, and implementation of, no-subcontracting or union standards clauses in the bargaining agreements. [Footnotes omitted.][26]

We emphasized that the focus in any section 8(e) scrutiny of a labor contract provision is on the provision *per se* and the circumstances surrounding the parties' agreement to its terms:

> To conclude that a contract term falling within the letter of § 8(e) properly falls within its prohibition there must be either a finding that both parties understood and acquiesced in a secondary object for the term, or a finding that secondary consequences

within § 8(e)'s intendment would probably flow from the clause, in view of the economic history and circumstances of the industry, the locality, and the parties. [Footnotes omitted.][27]

■ The analytical process dictated by *National Woodwork* and *Local 710* may be summarized as follows. Under the circumstances existing at the time the contractual provision in controversy was signed, was the object of the provision preservation of *fairly claimable work for members of the bargaining unit,* a primary objective? Or was the goal to use the contracting employer as a pawn in the union's labor disputes *with other employers?* Resolution of this ultimate issue presupposes answers to two preliminary questions:

1. What is the relevant bargaining unit?[28]

2. In connection with the operation or project of the contracting employer, which jobs are *fairly claimable* by the Union? Or, in *National Woodwork* terms, in which jobs does the union have a *valid work preservation interest?*

## III. INADEQUACY OF THE TRIAL EXAMINER'S FINDINGS TO SUPPORT AN 8(e) VIOLATION

■ It is clear on the basis of the record compiled in the Board proceeding,

---

24. In the companion case of Houston Insulation Contractors Ass'n v. NLRB, 386 U.S. 664, 87 S.Ct. 1278, 18 L.Ed.2d 389 (1967), the Court described its *National Woodwork* holding in these terms:

> *National Woodwork Mfrs., supra,* holds that collective activity by employees of the primary employer, the object of which is to affect the labor policies of that primary employer, and not engaged in for its effect elsewhere, is protected primary activity. 386 U.S. at 668. The Court held that members of a construction local could, consistent with section 8(b)(4)(B), refuse to handle prefabricated products to protect work for members of a sister local who were employed by the same contractor. Such a boycott is primary, the Court held, because its object is to affect the labor practices of the employer of the boycotting local and thus

"does not involve the employer in a dispute not his own." 386 U.S. at 669.

25. 118 U.S.App.D.C. 287, 335 F.2d 709 (1964).

26. *Id.* at 291, 335 F.2d at 713 (emphasis supplied).

27. *Id.* at 294, 335 F.2d at 716.

28. *See* Sheet Metal Workers Local 98 v. NLRB, 140 U.S.App.D.C. 83, 433 F.2d 1189 (1970), in which Judge Wright, who authored the opinion in *Local 710,* stated in dissent:

> Primary-secondary analysis hinges on a determination of the employee group which the work preservation agreement may legally protect. Unless the relevant unit of employees is clearly established, it

the trial examiner's decision, and the Board's decision and order that adequate consideration was not given to the important factors discussed above. Since findings with respect to those factors are prerequisites to any decision that section 8(e) has been violated, the Board's order restricting Local 223's administration of article II, section 2 and article VIII, section 2 of its collective-bargaining agreement with Gelfand cannot be allowed to stand.

First, the trial examiner and the Board failed to define the scope of the bargaining unit that Local 223 represents in its dealings with Gelfand. The

trial examiner did find that Gelfand is not a member of the Florida East Coast Sheet Metal Contractors Association,[29] so it is arguable that the relevant bargaining unit is limited to a single employer, Gelfand.[30] However, the record does not clearly reveal even the number and nature of sheet metal workers employed by Gelfand.[31] Consequently, it is unclear whose interests, if anyone's, Local 223 could legitimately seek to protect by its administration of the union standards clauses involved here. Conceivably, *no* member of the bargaining unit has the skills or experience to perform the work allegedly protected by the clauses

---

is impossible to decide whether a specific job has been customarily or traditionally done by them, or whether it is fairly claimable by them.
140 U.S.App.D.C. at 93, 433 F.2d at 1199.

29. Trial Examiner's Decision at 3, Joint App. at 38.

30. For a discussion of the peculiar problems that may arise when a multi-employer bargaining unit is involved, see Sheet Metal Workers Local 98 v. NLRB, 140 U.S.App. D.C. 83, 93–95, 433 F.2d 1189, 1199–1201 (1970) (Wright, J., dissenting). *See also* National Maritime Union v. Commerce Tankers Corp., 457 F.2d 1127 (2d Cir. 1972), in which the court held that "any bargaining unit for whom the union could justifiably preserve work would be composed solely of [the primary employer's] employees and could not justifiably include all [union] members . . . who await work assignments at a central hiring hall." 457 F.2d at 1137.

31. The following testimony of Mr. Lanny Gelfand, a partner in the Gelfand Roofing Company, is all that could be found on this subject in the hearing transcript:
Q. [By Counsel for the Board's General Counsel] Prior to the time you filed the charge in this case did you ever employ sheet metal workers?
A. [By Mr. Gelfand] Very rarely.
TRIAL EXAMINER: I take it there were some occasions when you did employ them.
THE WITNESS: Once or twice, yes, we have employed sheet metal workers before we had this problem.
Q. [By Mr. Grossman] About how many employees did you have altogether?
A. I would say that before this problem arose we had on two different occasions

one man each day, one man one day, and one man I believe for three days.
Q. You mean a sheet metal worker?
A. A sheet metal worker, right.
Q. How many employees did you have altogether?
TRIAL EXAMINER: Do you mean of all crafts?
MR. GROSSMAN: Yes, sir.
A. We have approximately 50 people working for us.
\* \* \* \* \*
Q. [By Mr. Grossman] What work had you assigned to sheet metal workers prior to the filing of the charge?
A. None.
Q. On those occasions when you used them—
A. [Interposing] The first time—as a matter of fact, both times they were hanging down-spouts for us.
Q. Did they ever fabricate any sheet metal products for you?
A. No, sir, they didn't.
Q. To whom had you assigned the work of installing stucco stops and gravel stops?
A. My roofers.
Hearing Transcript at 72–74, Joint App. at 130–32. It is not clear whether Mr. Gelfand's phrase "before this problem arose" means before Gelfand signed the contract with Local 223 or during the term of the contract but before the union's allegedly illegal actions. The trial examiner failed to clarify this ambiguity when he found: "Prior to May 21, 1970, Gelfand had no contract with [Local 223] and employed members of the latter only on very rare occasions, and when they were employed it was tion of sheet metal items." Trial Examiner's Decision at 5, Joint App. at 40.

(fabrication of stucco stops and gravel stops).[32] But the record is too sketchy to support this or any other inference about the scope and nature of the bargaining unit. On rehearing the examiner should develop the facts necessary to a finding on this question.

Second, the decisions at the Board level contain no findings on the crucial issue of whether the work here in dispute, fabrication of stucco stops and gravel stops, is work that is fairly claimable by the bargaining unit represented by Local 223.[33] In a section of his decision titled "The Union's Defense of Work Preservation," the trial examiner discusses, without reaching any conclusion, whether Local 223 had a fair claim to the work of fabricating filter racks for Union Air and United.[34] But he is silent on Local 223's asserted claim to the work of fabricating stucco and gravel stops for Gelfand. He did find, in another section of his decision:

> Prior to May 21, 1970, Gelfand had no contract with [Local 223] and employed members of the latter only on very rare occasions, and when they were employed it was always on a job-

site and never in the fabrication of sheet metal items. Indeed, the record is clear that prior to May 1970 Gelfand had no facilities to fabricate such items, and all such supplies, such as stucco stops, gravel stops, gutters, and downspouts, it purchased from local distributors, including East Coast Supply Company, Intercostal, Inc., and Southern Metals, Inc. . . .[35]

On the basis of this finding, the Board has argued in this court that " 'the record clearly indicates an attempt on the part of the Union to use the contract clauses in question for the purpose of "acquiring for its members work that had not previously been theirs." ' "[36]

However, there is evidence in the record that Local 223 is asserting a claim to work for Gelfand no broader than the work rights traditionally granted to Local members by other roofing contractors under the terms of the Standard Form of Union Agreement. The trial examiner received uncontradicted testimony that Local 223 members have customarily fabricated stucco stops and gravel stops for these other contractors.[37] Therefore, when Gelfand

32. *See* Meat and Highway Drivers Local 710 v. NLRB, 118 U.S.App.D.C. 287, 292, 335 F.2d 709, 714 (1964).

33. The parties do not dispute Local 223's assertion that fabrication of stucco stops and gravel stops is work covered by the terms of article II, section 2 and article VIII, section 2 of the collective-bargaining agreement, set out in note 2 *supra*. Article XXX, which along with article I defines the jurisdiction of Local 223, provides, "The fabrication and installation of all flashings, metal skylights, scuppers, pitch pans, roof expansion joints, gutters (excluding half round) and downspouts together shall all be considered one individual portion of a job or project site." Thus, when article II, section 2 refers to "perfabrication [sic] of materials covered herein," it refers to prefabrication of flashings. Uncontradicted testimony in the record establishes that "flashings" includes stucco stops and gravel stops. Hearing Transcript at 533–34, 548–49, Joint App. at 229–30, 234–35.

34. Trial Examiner's Decision at 17–19, Joint App. at 52–54.

35. *Id.* at 5, Joint App. at 40.

36. Brief for Respondent at 17, *quoting* Sheet Metal Workers Local 98 v. NLRB, 140 U.S. App.D.C. 83, 89, 433 F.2d 1189, 1195 (1970).

37. This evidence was supplied by Sidney Raymond, general foreman for Giffin Roofing Company, and Donald Cunningham, general foreman for Central Roofing and Supply Company. Both Giffin and Central are signatories to the Standard Form of Union Agreement to which Local 223 and Gelfand are parties. The relevant testimony of Raymond and Cunningham appears in the Hearing Transcript at 534–35, 548–51, Joint App. at 230–31, 234–37.
This evidence distinguishes the case at bar from Sheet Metal Workers Local 98 v. NLRB, 140 U.S.App.D.C. 83, 433 F.2d 1189 (1970), which was heavily relied upon by the trial examiner in his decision at 24, Joint App. at 59, and by the Board in its brief at 14, 16, 17, 18. While *Local 98* did involve the same contractual provisions as those involved here, the trial examiner found that the items whose fabrication the union claimed as unit work had traditionally been purchase items *throughout the industry* and that union members had never previously

signed the Standard Form of Union Agreement establishing relations with Local 223 for the first time, the Local may have expected that Gelfand would allocate work to union members in the same fashion as other contractors who were signatories of the Agreement. Both the trial examiner and the Board failed to come to grips with this evidence and indeed omitted any mention of it.[38]

The lack of findings here on the issue of what jobs were fairly claimable by the union distinguishes this case from the cases relied on by the trial examiner in his decision.[39] In *Sheet Metal Workers Local 141 (Cincinnati Sheet Metal and Roofing Company)* [40] the trial examiner explicitly stated: " . . . I have found that the fabrication of the eleven items as an overall practice, to be neither unit work nor fairly claimable as unit work." [41] In *Sheet Metal Workers Local 98 (Cincinnati Sheet Metal and Roofing Company)* [42] the same examiner as in *Local 141* employed almost identical language in making his finding that the union had no valid work preservation interest in the jobs claimed.[43] The conspicuous lack of such a finding in this case is fatal to the Board's order on this point.

Finally, the trial examiner and Board failed to accord adequate consideration to the ultimate question in any 8(e) case: Under the circumstances existing at the time the disputed contractual provision was executed, was the object of the provision preservation of fairly claimable work for the bargaining unit, or did the provision have an impermissible secondary objective? There is nothing in the record to suggest that the trial examiner inquired into "all the surrounding circumstances" of the provisions in controversy here, as required by *National Woodwork*.[44] Furthermore, instead of focusing on the contractual provisions *per se* in evaluating their objectives, the trial examiner based his finding of an 8(e) violation on the union's *conduct* in *administering* the provisions. He stated:

> Having found and concluded that [Local 223's] pressure on Gelfand was secondary in character, if [sic] follows that Article II, Section 2, and Article VIII, Section 2, of the contract between [Local 223] and Gelfand, set forth above, were applied and sought to be enforced by [Local 223] in a manner which violates Section 8(e) of the Act. I so find and conclude.[45]

made the items at the jobsite. 140 U.S. App. D.C. at 88, 433 F.2d at 1194.

38. Prior performance of work for the particular employer should not be a prerequisite to a fair claim to that work by the union. *See* Bricklayers' Local 8 (BESCO), 180 N. L.R.B. 43 (1969), in which the Board held that a union could have a valid work preservation objective in its contractual relations with an employer that had not previously been in business. In so holding, however, the Board relied on an explicit recitation in the contract that the union had work preservation rights in the claimed jobs. Another aspect of the Board's order was set aside in Western Monolithics Concrete Products, Inc. v. NLRB, 446 F.2d 522 (9th Cir. 1971).

39. The revelant passage is quoted in the text accompanying note 8 *supra*.

40. 174 N.L.R.B. 843 (1969), enforced, NLRB v. Sheet Metal Workers Local 141, 425 F.2d 730 (6th Cir. 1970).

41. 174 N.L.R.B. at 851.

42. 174 N.L.R.B. 104 (1969), enforced as modified, Sheet Metal Workers Local 98 v. NLRB, 140 U.S.App.D.C. 83, 433 F.2d 1189 (1970).

43. 174 N.L.R.B. at 112. *See also* note 37 *supra*.

44. *See* notes 19–20 *supra* and accompanying text. For example, it is not clear what "the relations between the union and the employers who would be boycotted" under the provisions are. If the Sheet Metal Workers International has been actively attempting to unionize the suppliers of prefabricated stucco stops and gravel stops, it might be inferred that one of the objectives of the disputed provisions is to use Gelfand to apply pressure on its suppliers to unionize. This would of course be an impermissible objective under section 8(e).

45. Trial Examiner's Decision at 24, Joint App. at 59.

This approach obviously does not conform to the analysis dictated by *National Woodwork* and *Local 710*, which treat the contractual provision *per se* and the circumstances of its execution separately from the union's conduct in administering the provision. Moreover, consistent application of such inverted reasoning would be grossly inequitable to unions and their members, *for valid work preservation rights could then be irrevocably forfeited on the basis of just one instance in which the union attempted to assert those rights by means of proscribed conduct tainted by an unlawful secondary purpose.*

Because the trial examiner failed to inquire into what jobs were fairly claimable by Local 223, he ignored evidence in the record indicating that the objective underlying the disputed contract provisions was to ensure that the work of fabricating stucco stops and gravel stops for Gelfand's construction projects was performed by members of the bargaining unit represented by Local 223. Union business manager Strong testified, without contradiction,[46] that during the discussions leading up to execution of the Local 223–Gelfand contract, Abraham Gelfand stated his intention to establish a sheet metal fabricating shop and to employ sheet metal workers therein.[47] This testimony, together with the evidence that members of Local 223 have traditionally been employed to fabricate stucco and gravel stops for other roofing contractors in the region,[48] raises the inference that the underlying *purpose* of article II, section 2 and article VIII, section 2 of the Standard Form of Union Agreement is the primary one of protecting work for members of the bargaining unit. If this is true (we do not decide the factual question here), then on all precedent in the Supreme Court and this court there was no section 8(e) violation in this case.

## IV. CONCLUSION

The fundamental test of *National Woodwork* is "whether the agreement or its maintenance is addressed to the labor relations of the contracting employer *vis-à-vis* his own employees."[49] There is a lack of findings, as above pointed out, on crucial factors, which is fatal to a finding of a section 8(e) violation. This case is hereby remanded to the Board for reconsideration and further evidence-gathering directed at making findings on the crucial factors enumerated herein.[50]

So ordered.

---

46. The trial examiner stated: ". . . I have concluded that I cannot credit [Strong] except in those instances where (a) the particular fact is not in dispute; (b) his testimony is in the nature of an admission against interest; or (c) he is corroborated by other evidence which I find credible." Trial Examiner's Decision at 8 n. 7, Joint App. at 43. However, the testimony of Strong that is cited herein was not directly contradicted by any other witness.

47. Hearing Transcript at 562–72, 630, Joint App. at 240–45, 249. Strong's account of his conversation with Gelfand was corroborated by the testimony of Richard Tucker, who is the business representative of Local 223. Hearing Transcript at 715–16, Joint App. at 255–56.

48. *See* note 37 *supra* and accompanying text.

49. 386 U.S. at 645.

50. The Board did attempt to narrow the scope of its order by prohibiting the union from enforcing the disputed provisions only "insofar as these clauses are applied to prohibit the use of nonunion label products." However, under *National Woodwork*, if the union has valid work preservation rights with respect to stucco and gravel stops, it could legally interpret the disputed provisions to preclude use by Gelfand of any stops fabricated by third parties, whether union label bearing or not. *See* 386 U.S. at 646.